# Illinois Official Reports

## Supreme Court

<div style="border:1px solid">

### *People v. Jackson*, 2020 IL 124112

</div>

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AARON JACKSON, Appellant. |
| Docket No. | 124112 |
| Filed | March 19, 2020 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of St. Clair County, the Hon. John Baricevic, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, John M. McCarthy and Catherine K. Hart, Deputy Defenders, and Susan M. Wilham, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.<br><br>Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Michael L. Cebula, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices            JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Garman, Karmeier, and Theis concurred in the judgment and opinion.

Justice Michael J. Burke took no part in the decision.

## OPINION

¶ 1      Following a jury trial in the circuit court of St. Clair County, defendant, Aaron Jackson, was convicted of first degree murder (720 ILCS 5/9-1(a) (West 2008)) and was sentenced to a term of 35 years' imprisonment. The appellate court affirmed. 2018 IL App (5th) 150274. This court allowed defendant's petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. July 1, 2018)). We now affirm the judgment of the appellate court.

¶ 2                            I. BACKGROUND

¶ 3      On April 1, 2010, just before 6 a.m., the victim, John Thornton, mayor of Washington Park, Illinois, was fatally shot at close range while seated in his white four-door Buick Regal. Witnesses told police that they heard gunshots, saw the victim's car crash into a tree, and then saw defendant exit the victim's vehicle and get into a waiting vehicle, which drove from the scene. The victim was found slumped over in the driver's seat of his car. He sustained three gunshot wounds to the right side of his chest. Both front airbags were deployed. No firearm was recovered, but police found three spent bullets inside the vehicle. On May 28, 2010, a grand jury indicted defendant of first degree murder for the shooting death of the victim.

¶ 4                            A. First Trial

¶ 5      Defendant's first jury trial, which commenced on October 17, 2011, ended in mistrial on October 20. Testimony from the mistrial relevant to this appeal comes from State witnesses Nortisha Ball and Laqueshia Jackson. Ball's testimony is relevant because defendant argues that inconsistencies in her testimony from the mistrial and retrial rendered the evidence insufficient to convict him of first degree murder. Jackson's testimony is relevant because defendant argues that defense counsel was ineffective for failing to call her as a witness at his retrial.

¶ 6      At the time of trial, Ball was being held on pending charges of residential burglary and theft. Ball acknowledged that she was not promised anything in exchange for her trial testimony. Ball testified that she met with Illinois State Police Special Agent Joseph Bates and gave him a statement concerning what she witnessed. Her statement was videotaped.

¶ 7      Ball's trial testimony was inconsistent in some respects with her videotaped statement. In her statement, Ball acknowledged telling Special Agent Bates that she heard two gunshots and that, after the victim's car crashed into the tree, she saw a man she knew as "Chill" exit the vehicle. Ball explained that defendant was known as "Chill." Ball told Bates that, after defendant exited the crashed vehicle, he got into a red Impala and drove from the scene.

¶ 8    Ball testified at trial, however, that, just before the victim's car hit the tree, she saw someone get out of the driver's side of the vehicle and thought that person might have been defendant. Ball further testified that she could not remember any details of her statement or conversation with Bates because she was under the influence of drugs or alcohol during the interview.

¶ 9    A week after the shooting, Ball met with Special Agent Bates for a follow-up interview. During the interview, Ball picked defendant's picture out of a six-picture photo array. Ball testified that she circled defendant's picture because Bates asked her if she knew any of the people pictured in the photo array and that defendant was the only person she recognized.

¶ 10    Laqueshia Jackson testified that on April 1, 2010, she was staying overnight at her mother's house when she received an early morning call from ADT Security Services notifying her that her home's burglar alarm had been activated. Jackson drove to her house and parked in the driveway but decided not to enter the house because there were no police on the scene. Jackson was turning out of the driveway to return to her mother's house when she heard gunshots, and as she drove further up the street, she heard a "loud boom" and then saw that a white car had crashed into a tree.

¶ 11    Jackson slowed her vehicle and then saw a man she knew as "Chill" exit the passenger side of the crashed car and "limp" to a white Suburban. Jackson testified that the Suburban was owned and driven by her ex-boyfriend, David Taylor. Jackson met with Special Agent Bates and, during the interview, picked defendant's picture out of a photo array. Jackson testified that she recognized defendant not only from seeing him around the neighborhood but also from his limp, which she believed was caused by a recent gunshot injury. Jackson made an in-court identification of defendant as "Chill."

¶ 12    Prior to commencing proceedings on the second day of trial, and outside the presence of the jury, the trial court informed counsel for both sides that it had become aware of anonymous threats made against Jackson and her children. The trial court questioned the assistant state's attorneys as to why the court had to learn of this development "second hand." The trial court admonished the assistant state's attorneys of their duty to promptly inform the court of such information. The trial court directed the assistant state's attorneys to investigate the matter and report back to the court.

¶ 13    On the next day of trial, during a break in the proceedings, one of the assistant state's attorneys informed the trial court and defense counsel that his office had received an anonymous phone call stating that, if Jackson were recalled to testify, she should be questioned as to whether a police officer offered her a bribe to testify that he was never at the crime scene. The officer in question was Washington Park detective Kim McAfee, who was one of the detectives assigned to investigate the shooting of the victim. At the time of trial, Detective McAfee had been indicted on federal charges of business fraud unrelated to defendant's case.

¶ 14    After discussing the matter off record, the trial court agreed that Jackson should be recalled and questioned outside the presence of the jury as to the validity of the alleged bribe. The proceedings were continued while the state's attorney's office attempted to locate Jackson.

¶ 15    Later that day, Jackson returned to court and underwent questioning, outside the presence of the jury, regarding the alleged bribe. Jackson testified that she was never offered a bribe or given any money from a police officer concerning her testimony. Jackson testified that

Detective McAfee was at the crime scene when she spoke with another investigating officer but that she never spoke directly to McAfee.

¶ 16    Jackson was also questioned about the anonymous threats she had received. Jackson explained that she did not want to testify any further because she had received anonymous phone calls threating her and her children. She stated that the caller knew the times she left court, where she attended school, where she lived, and the times her children got on and off their school bus. Jackson also testified that someone claiming to be from the state's attorney's office had called her children's school asking to speak with them. Jackson claimed that her children were afraid to leave the house or go to school.

¶ 17    Defense counsel then expressed concern that defendant could be prejudiced if Jackson was recalled for additional cross-examination and the jury observed her terrified demeanor and saw her "sobbing." Defense counsel consulted with defendant and deferred to his agreement to have Jackson cross-examined in the presence of the jury but outside the presence of courtroom spectators.

¶ 18    Jackson returned to the witness stand and in the presence of the jury acknowledged that she was previously questioned as to whether she ever spoke with Detective McAfee. When defense counsel asked Jackson what her response had been to this question, she initially claimed she could not remember but then fell silent and failed to respond to any further questioning.

¶ 19    At this point, the jury was ushered out of the courtroom, and a short recess was taken. Jackson subsequently suffered a seizure. When the jurors returned to the courtroom, the trial court released them for the day but, before doing so, admonished them not to discuss the case and to avoid all media coverage of the trial.

¶ 20    After the jury was released, the trial court called deputy court clerk Mary Ponder to the witness stand and questioned her about Jackson's condition. Ponder testified that Jackson was crying and claimed she had seen a dark-haired woman with blonde highlights in the hallway of the courthouse and that this woman was the same person who had shown up at her house the previous night. The trial court then agreed that the record should reflect that Jackson went into a "stupor" on the witness stand, the jury was subsequently removed from the courtroom, and thereafter Jackson suffered a seizure and was taken to the hospital by ambulance.

¶ 21    The following morning, the trial court recalled Ponder to question her, outside the presence of the jury, about a phone call she received that morning from Jackson's sister, Angela Dodd. Ponder testified that Dodd told her that Jackson suffered another seizure and was admitted to the hospital. Jackson's blood pressure was elevated, and paramedics were concerned she might suffer a stroke. According to Dodd, Jackson told the paramedics "If I do have a stroke, let me die because if I don't die they're going to kill me." Dodd also told Ponder that she witnessed Detective McAfee tell Jackson that if she kept her mouth shut, he would pay her off.

¶ 22    Following Ponder's testimony, defense counsel moved for a mistrial on the ground that defendant's right to a fair trial was prejudiced by what jurors saw when Jackson went into a stupor on the witness stand and by what they heard when she suffered a seizure within hearing distance of the jury room.

¶ 23    The trial court denied the motion, stating in part that it did not believe that Jackson's illness in and of itself was grounds for a mistrial. The trial court stated that "[a]ll the jury knows is that the witness became ill." The trial court added there was no reason to assume the jury

believed that Jackson's illness was related to defendant. The trial court also expressed skepticism that the jury might have overheard anything in connection with the treatment Jackson received after suffering her seizure, pointing out that the jury was separated in "another room."

¶ 24 The trial court then called bailiff Tyrone Jordan to the witness stand. Jordan testified outside the presence of the jury that a woman identifying herself as Angela had called the court and left a phone number. Jordan called the phone number and spoke with a woman who identified herself as Angela Dodd, Jackson's sister. Dodd told Jordan that her nephew had received an anonymous phone call telling him that Jackson should not testify in the case and that defendant "could beat" the case if she refused to testify.

¶ 25 When the court proceedings resumed after lunch, the assistant state's attorney advised the court and defense counsel about an anonymous phone call his office received during lunchtime. The caller stated that the state's attorney's office should investigate Detective McAfee and claimed that the detective offered Laqueshia Jackson money in exchange for her testifying that the detective was never at the crime scene. The assistant state's attorney then told the court and defense counsel about a recent phone conversation he had with Jackson where she admitted that Detective McAfee had offered her money in exchange for her testimony. The assistant state's attorney added however that Jackson continued to insist that her prior testimony about the shooting was "accurate."

¶ 26 Defense counsel renewed his motion for a mistrial. The trial court granted the motion, explaining that the latest revelations of possible witness tampering and alleged perjured testimony had created a situation that deprived defendant of a fair trial.

¶ 27 B. Second Trial

¶ 28 Defendant's second jury trial began on April 24, 2012. Sergeant Wendell Wilson of the Washington Park Police Department was the first officer on the scene. Sergeant Wilson testified that as he was securing the crime scene he was approached by Ball, who informed him that she had information regarding the shooting. Sergeant Wilson was familiar with Ball because he had arrested her on prior occasions. Sergeant Wilson secured Ball in his squad car until she was turned over to Detective McAfee.

¶ 29 Ball testified again for the State. At the time of trial, she was serving a four-year prison sentence for burglary. Ball testified that on April 1, 2010, at about 5:30 a.m., she was hanging outside with some people when she saw and heard a car crash into a tree. Ball testified that, after the crash, she saw a male passenger exit the vehicle. Ball stated that the man's hair was braided, but she could not see his face. The State attempted to impeach Ball with the videotaped statement she gave to Special Agent Bates.

¶ 30 Ball testified that she remembered giving the statement but could not recall any of its details. Ball reluctantly acknowledged that her memory would be refreshed if she watched the videotaped statement. The trial court, along with defense counsel, the assistant state's attorneys, and Ball, watched the videotaped statement outside the presence of the jury.

¶ 31 Ball was recalled to the witness stand and, in the presence of the jury, testified that her memory was refreshed after viewing her videotaped statement. Ball admitted telling police that, after the victim's car crashed into the tree, she saw "Chill" exit the car and limp to a red

Chevy Impala, which drove from the scene. Ball testified that she recognized "Chill" because he once dated her sister.

¶ 32   Ball claimed she was standing across the street from the car crash when she was approached by a police officer she knew as Wendell Wilson. Ball testified that she and Wilson talked but that they did not discuss the crash. Ball claimed that she spoke with Detective McAfee and Special Agent Bates that morning and told them what she witnessed concerning the crash. After Ball claimed that she never told police she heard gunshots, she was impeached with her prior statement, where she claimed she heard gunshots. Ball responded that she had lied to the police. Ball also testified that she picked defendant's picture out of a six-picture photo array because Detective McAfee told her to circle defendant's picture.

¶ 33   At this point, over defense counsel's objection, the trial court granted the State's request to treat Ball as a hostile witness in order to impeach her with her prior statement to Special Agent Bates. Ball initially claimed that she lied to Bates but then claimed she was under the influence. Ball acknowledged however that the information in her statement was probably more accurate than her trial testimony because the statement was made closer in time to the incident. Ball admitted telling Special Agent Bates that she witnessed defendant exit the victim's car after it crashed into the tree but then testified that she did not know who the person was who exited the vehicle and denied it was defendant.

¶ 34   On cross-examination by defense counsel, Ball testified that, after the car crash, Detective McAfee transported her to the police station. Ball testified that, during the ride to the police station, McAfee told her that, if she saw something, to tell him; otherwise she would be arrested. Ball testified that McAfee told her that he already knew from another witness that defendant was the person who got out of the victim's car after it crashed into the tree. Ball claimed that McAfee told her to tell the police that defendant was the person who exited the crashed vehicle; otherwise she would be arrested. Ball testified that, when she arrived at the police station, she spoke with Special Agent Bates. When defense counsel asked Ball if anyone had threatened her, she responded that she had not been threatened but then claimed she "got scared" when her cousin informed her that her name was in the newspaper.

¶ 35   On redirect examination, and over defense counsel's objection, the trial court permitted the State to impeach Ball with a letter she wrote to the trial court while in jail. In the letter, Ball writes that she is "scared," she requests to be put in protective custody, and she states, "Please help me. I'm admitting to everything that happened. It was Jackson that killed the mayor."

¶ 36   Ball acknowledged writing the letter but claimed it was not true. Ball testified that she wrote the letter because she was mad at something that happened long ago, which she refused to discuss, but which she claimed had nothing to do with defendant's case. The letter was admitted into evidence over defense counsel's objection.

¶ 37   Special Agent Bates testified that, after he interviewed Ball, he focused his investigation on defendant. Bates interviewed and obtained a videotaped statement from defendant on the morning of the murder. The videotaped interview was played for the jury. In the interview, defendant claims that in the early morning hours of April 1, 2010, he was walking down 47th Street when he heard gunshots and started running. He fell and thought he had been shot. He went to his girlfriend's apartment but could not remember how he got there or anything else that happened during that time. In his videotaped statement, defendant can be seen limping.

¶ 38    Gilda Lott testified for the State regarding the events at issue. She was not a witness at defendant's first trial. Police first interviewed Lott in March 2012, nearly two years after the murder. Lott was in jail awaiting trial on a charge of reckless driving.

¶ 39    At the time of trial, there were criminal charges pending against Lott. She acknowledged that no threats or promises were made to her in exchange for her trial testimony.

¶ 40    Lott testified that on April 1, 2010, at around 5 a.m., she was standing outside her daughter's house talking with friends, including Nortisha Ball, when she saw a car come down 47th Street and hit a tree. Lott claimed she did not see who was driving the car but at the same time testified that, after the car crashed into the tree, she saw "Chill" get out of the driver's side of the vehicle. Lott testified that, after Chill exited the vehicle, he ran and "jump[ed] in a car with somebody else." When Lott was asked to clarify whether defendant ran or walked, she testified that he was "limping." Lott was also asked if she ever gave a statement to police claiming that the driver of the waiting vehicle got out and helped defendant into the vehicle. Lott admitted that, if she made the statement, it would be accurate. Lott made an in-court identification of defendant as "Chill" and testified that she knew him from the neighborhood.

¶ 41    On cross-examination, defense counsel attempted to impeach Lott with statements she made to him and his investigator Michael Boyne during a speakerphone conversation and subsequent face-to-face meeting. Defense counsel inquired if Lott remembered telling him and his investigator that she did not actually see anyone get out of the car after it crashed into the tree and that she identified defendant because she thought that was what the police wanted to hear and she believed it would help her case.

¶ 42    Lott denied seeking any favorable treatment in return for her statement to the police. Lott acknowledged her conversations with defense counsel and his investigator but claimed she could not remember what she said during those conversations because she had recently been hit in the head with a baseball bat, causing memory loss. When asked how she could remember events that occurred on the morning of the murder, two years before trial, if she was unable to remember a conversation that took place three days earlier, Lott responded "Because when I got hit in my head, before I could remember very well."

¶ 43    On redirect and recross-examinations, the State and defense counsel continued questioning Lott as to whether she saw defendant get out of the car after it crashed into the tree. Lott insisted that she saw defendant exit the crashed vehicle, from the driver's side.

¶ 44    Boyne testified for the defense about the conversations he and defense counsel had with Lott. According to Boyne, when Lott was asked if she ever saw defendant get out of the car after it crashed into the tree, she responded that she saw the car crash but did not see who exited the vehicle after the crash. Boyne testified that, when he asked Lott why she identified defendant to the police, she responded that she thought it would help her get out of jail. Boyne testified that, although Lott agreed to give him a written statement to that effect, she never did so.

¶ 45    Cynthia Hooker, defendant's girlfriend and the mother of two of his children, testified that on the night of March 31, 2010, she left work and returned to her apartment at about 11 p.m. Defendant was at the apartment, but he left shortly thereafter in her red Chevy Impala. Hooker testified that she went to sleep and, when she woke up the next morning just before 7 a.m., she saw that defendant had returned to the apartment. Hooker and defendant argued about him being out all night. Defendant claimed he was out gambling.

¶ 46    Hooker testified that she and defendant were in her apartment watching television when a news report came on about the fatal shooting of the victim. The news report stated that the police were looking for a red Impala. A few hours later, police arrived at Hooker's apartment. The police towed her car and then came to her front door. Hooker testified that defendant got dressed and told her that he did not know why the police were there but that they were probably looking for him. The parties stipulated that, on the day of the shooting, Detective McAfee transported defendant to the police station.

¶ 47    Dr. Raj Nanduri, who conducted the autopsy on the victim, testified that the victim suffered three gunshot wounds to the front right side of his chest, including a contact wound underneath his right nipple. Dr. Nanduri concluded, within a reasonable degree of scientific certainty, that the victim died as a result of the gunshot wounds.

¶ 48    The State presented expert testimony concerning the forensic evidence recovered in this case. Abby Keller, a crime scene investigator with the Illinois State Police, photographed the victim's vehicle, including blood on the airbags, the dashboard between the airbags, the seats, the door panels, the ceiling of the vehicle, and the exterior of the vehicle near the top of the windshield on the passenger side and the rear passenger-side door. Swabs of the blood evidence were collected. Three spent bullets were recovered from inside the vehicle along with a cell phone. Keller dusted the vehicle for fingerprints and collected 57 lifts.

¶ 49    Melissa Gamboe, a fingerprint examiner with the Illinois State Police, testified that she examined the latent fingerprints lifted from the victim's car and identified one of the fingerprints as belonging to defendant. The fingerprint was found near the front passenger door handle underneath the window.

¶ 50    Robert Berk, a trace evidence analyst with the Illinois State Police, analyzed the gunshot residue kits performed on defendant's hands. He also analyzed defendant's clothing for the presence of gunshot residue and residue from the deployed airbags. No airbag residue was found on defendant's hands or clothing. However, gunshot residue was found on his left hand, the left shoulder area of his T-shirt, and the right thigh area of his jeans.

¶ 51    Ellen Chapman, a forensic scientist with the Illinois State Police, analyzed the gunshot residue kits performed on defendant's hands. She found gunshot residue on his left hand, but none was found on his right hand.

¶ 52    Jay Winters, a forensic scientist with the Illinois State Police, performed DNA testing on a small bloodstain recovered from defendant's jeans. Due to the small size of the bloodstain, Winters was only able to obtain a partial DNA profile, which was from a male. Winters compared the partial DNA profile to known DNA standards obtained from defendant and the victim.

¶ 53    Defendant was excluded as a possible contributor to the partial DNA profile recovered from his jeans. Winters testified that, although the victim could not be excluded as a contributor, the partial DNA profile was "consistent" with having originated from the victim.

¶ 54    Winters added that, although the partial DNA profile recovered from defendant's jeans did not precisely "match" the victim's DNA, he opined within a reasonable degree of scientific certainty that it "likely" came from the victim. Utilizing updated DNA recalculations, Winters explained that the partial DNA profile occurred in only 1 out of every 46,000 unrelated African American individuals, 1 out of every 73,000 unrelated Caucasian individuals, and 1 out of every 17, 000 unrelated Hispanic individuals.

¶ 55    The jury found defendant guilty of first degree murder, and he was sentenced to 35 years in prison. On September 7, 2012, following a hearing, the trial court denied defendant's posttrial motion. Defendant filed his appeal the same day.

¶ 56    A week later, defendant, *pro se*, sent a letter to the trial court arguing that the evidence was insufficient to prove him guilty of first degree murder. Defendant also argued that he was not fairly represented by his trial counsel. The trial court did not address the letter.

¶ 57    The appellate court dismissed defendant's pending appeal as premature but remanded the matter to the trial court to conduct a preliminary inquiry into defendant's *pro se* claims of ineffective assistance of counsel in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984). Following a preliminary *Krankel* inquiry, the trial court concluded that defendant's *pro se* claims were meritless and declined to appoint new counsel to argue those claims.

¶ 58    Defendant appealed on a number of grounds, each of which the appellate court rejected. 2018 IL App (5th) 150274. Pertinent here, the appellate court held that the evidence was sufficient to allow a reasonable jury to find defendant guilty of first degree murder beyond a reasonable doubt. *Id.* ¶¶ 50-58. The appellate court also rejected defendant's contention that he was denied a fair trial by the prosecutor's closing argument. *Id.* ¶¶ 69-78. The appellate court also held that the trial court's error in permitting the State to participate in the preliminary *Krankel* hearing in an adversarial manner was harmless beyond a reasonable doubt. *Id.* ¶¶ 81-105. Finally, the appellate court found that the trial court did not err in refusing to appoint new counsel to investigate defendant's claims of ineffective assistance of trial counsel. *Id.* ¶¶ 106-22.

¶ 59    Defendant appeals to this court. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

¶ 60                                    II. ANALYSIS

¶ 61    Before this court, defendant contends that his conviction should be reversed because the evidence was insufficient to prove him guilty beyond a reasonable doubt. Defendant alternatively seeks a new trial because the prosecutor made two mischaracterizations during closing argument that were prejudicial and constituted reversible error. Also, defendant seeks, as alternative relief, appointment of counsel to address the merits of his *pro se* claim of ineffective assistance of counsel, pursuant to *Krankel*, 102 Ill. 2d 181.

¶ 62                            A. Sufficiency of the Evidence

¶ 63    Defendant contends that the evidence was insufficient for the jury to find him guilty of first degree murder beyond a reasonable doubt. Defendant argues that the two eyewitnesses to the incident, Nortisha Ball and Gilda Lott, were not credible because they gave inconsistent and contradictory accounts of the incident. Defendant also argues that the physical evidence linking him to the crime scene "was weak" and did not place him inside the victim's car.

¶ 64    When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009); *People v. Evans*, 209 Ill. 2d 194, 209 (2004). This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. *People v. Tenney*, 205 Ill. 2d 411, 427 (2002). Further, circumstantial

evidence that meets this standard is sufficient to sustain a criminal conviction. *Jackson*, 232 Ill. 2d at 281. "Under this standard of review, it is the responsibility of the trier of fact to 'fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Howery*, 178 Ill. 2d 1, 38 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see *Jackson*, 232 Ill. 2d at 281. It is not the function of the reviewing court to retry the defendant. *Evans*, 209 Ill. 2d at 209; *Tenney*, 205 Ill. 2d at 428. Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67; *Tenney*, 205 Ill. 2d at 427.

¶ 65 Defendant argues that Ball and Lott were not credible because they gave inconsistent and contradictory versions of the incident. Defendant points out that Ball claimed that, after the mayor's car crashed into the tree, she saw defendant exit from the front passenger side of the car, while Lott testified that she saw him exit from the driver's side of the vehicle. We do not believe that this discrepancy rendered the whole of Lott's testimony unworthy of belief. See, *e.g.*, *People v. Brooks*, 187 Ill. 2d 91, 133-34 (1999) (discrepancies such as whether defendant was in the front or rear passenger seat of a vehicle are to be expected anytime several persons witness the same event under traumatic circumstances). Also, we observe that it is highly unlikely he would have exited from the driver's side of vehicle since the victim's body was found in the driver's seat, slumped over the steering wheel. Moreover, we note that these two eyewitnesses were generally consistent on key points in regard to how the incident unfolded, such as the car crashing into a tree, defendant exiting the vehicle, and defendant limping from the vehicle. In this case, jurors were not required to disregard Lott's testimony in its entirety because she did not remember which side of the vehicle defendant exited from after the car crash.

¶ 66 The discrepancies and inconsistencies defendant points to, such as where the eyewitnesses were standing when they observed the crash, how defendant exited the crashed vehicle, and who called the police, are issues to be resolved by the jury as the trier of fact. It is the function of the jury as the trier of fact to assess the credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211; *Tenney*, 205 Ill. 2d at 428.

¶ 67 Defendant also argues that Ball and Lott were not credible because they recanted their prior testimony and statements to police identifying defendant. It is well settled that the recantation of testimony is generally regarded as unreliable, especially where it might have resulted from duress or perceived threat. *Brooks*, 187 Ill. 2d at 132. Under such circumstances, it is for the trier of fact to determine the credibility of the recantation testimony. *Id.* Here, in light of Ball's letter to the trial court requesting that she be placed in protective custody, a rational trier of fact could have concluded that she recanted due to threats from defendant's family and that the recantation was not credible.

¶ 68 Lott was asked if she ever gave a statement to police identifying defendant as the person who exited the victim's vehicle after it crashed into the tree. Lott admitted that, if she made the statement, it would be accurate. It was up to the jury as the trier of fact to determine whether

Lott's statement was more credible than her subsequent recantation. See *id.* at 133 (trier of fact could have reasonably believed that statement implicating defendant was truthful and that subsequent recantation was untruthful).

¶ 69        Continuing his challenge to the sufficiency of the evidence, defendant points to Lott's issues with her memory and her alleged motive to fabricate her testimony because she was in jail when she identified defendant. Defendant's challenge addresses the province of the jury, not this court of review. The jury observed Lott testify and was made aware of her criminal history and memory problems. The jury, as the trier of fact, was in a much better position than we are to determine Lott's credibility and the weight to be accorded to her testimony. *Tenney*, 205 Ill. 2d at 428-29; *People v. Gray*, 2017 IL 120958, ¶ 44 (witness memory lapse does not mandate testimony be wholly disregarded).

¶ 70        Defendant also argues that the physical evidence linking him to the crime scene "was weak" and did not place him inside the victim's car. Defendant observes that no hair or fiber evidence connected him with the car, there was no evidence that he came into contact with an automobile airbag, and no gun was recovered. However, it is not necessary that the trier of fact find each fact in the chain of circumstances beyond a reasonable doubt. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt. *Evans*, 209 Ill. 2d at 209. Further, the trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281; see *Siguenza-Brito*, 235 Ill. 2d at 229.

¶ 71        "[T]he mandate to consider all the evidence on review does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom. To engage in such an activity would effectively amount to a retrial on appeal." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). In this case, the evidence taken together supports the jury's verdict.

¶ 72        Defendant's fingerprint was found near the passenger door handle of the victim's car, and gunshot residue was found on defendant's hand and clothing. Moreover, an expert witness opined, within a reasonable degree of scientific certainty, that the partial DNA profile recovered from defendant's jeans "likely" came from the victim because the profile occurred in only 1 out of every 46,000 unrelated African American individuals, 1 out of every 73,000 unrelated Caucasian individuals, and 1 out of every 17, 000 unrelated Hispanic individuals.

¶ 73        Ball and Lott testified and gave statements claiming that, when defendant exited the victim's vehicle after it crashed into the tree, he was limping. This was corroborated by defendant's videotaped statement showing his limp.

¶ 74        Ball testified that, after defendant exited the victim's crashed vehicle, he got into a red Impala, the same type of automobile defendant's girlfriend owned, which she testified he was driving at the time of the incident. In addition, defendant's videotaped statement, which was played for the jury, placed him at the crime scene at the time the shooting occurred, and he had no explanation as to how he arrived back at his girlfriend's apartment after the shooting.

¶ 75        We have reviewed all of the evidence presented in defendant's trial in the light most favorable to the prosecution. We cannot say that the evidence was so improbable, unsatisfactory, or unreasonable as to justify a reasonable doubt of defendant's guilt.

¶ 76                              B. Prosecutor's Closing Argument
¶ 77                              1. Mischaracterization of the Evidence
¶ 78        Defendant next contends that the prosecutor exaggerated two pieces of evidence during the State's closing argument. Defendant argues that these two mischaracterizations were improper and prejudicial and denied him a fair trial. Before this court, defendant seeks a new trial.

¶ 79        During the State's closing argument, the prosecutor reminded the jury of DNA analyst Winters's testimony that the bloodstain on defendant's jeans revealed a partial profile that occurs in only 1 in 46,000 African Americans and Winters's opinion that the blood could not have been defendant's and was "likely" the victim's. The prosecutor then employed an example with this statistic to show the likelihood that the bloodstain came from the victim, during which he used the word "matched." The prosecutor then repeated that the DNA analyst could not say definitively that the blood was that of the victim. However, the prosecutor argued that, based on the statistical likelihood, the jury could find that the blood came from the victim.

¶ 80        Also, during the State's initial closing argument, the prosecutor remarked that the defendant's fingerprint was found on the victim's car. During defendant's closing argument, defense counsel reminded the jury of the State's fingerprint expert's testimony that it was impossible to determine the age of a fingerprint. Defense counsel also argued that numerous fingerprints were lifted from the victim's vehicle. During the State's rebuttal closing argument, the prosecutor addressed defendant's argument that numerous other fingerprints were found on the victim's car that did not match those of defendant. The prosecutor told the jury that the State's fingerprint expert stated that "a fresh print" was recovered.

¶ 81        Defendant acknowledges that he failed to object to each of these two mischaracterizations at trial and, therefore, has failed to preserve this issue for appellate review. See *People v. Enoch*, 122 Ill. 2d 176, 188 (1988) (to preserve an issue for appellate review, a defendant must object both at trial and in a posttrial motion). Recognizing the procedural default, defendant seeks review by invoking the plain-error doctrine of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). The doctrine serves as a narrow and limited exception to the general rule of procedural default. *People v. Herron*, 215 Ill. 2d 167, 177 (2005) (collecting cases). A reviewing court will consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007) (citing *Herron*, 215 Ill. 2d at 186-87). When a defendant fails to establish plain error, the result is that his procedural default must be honored. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). In addressing an assertion of plain error, it is appropriate to determine whether reversible error occurred at all. See *People v. Hood*, 2016 IL 118581, ¶ 18; *People v. Harris*, 225 Ill. 2d 1, 24 (2007).

¶ 82        Generally, prosecutors have wide latitude in the content of their closing arguments. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). They may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. A reviewing court will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 83    The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error. *People v. Nieves*, 193 Ill. 2d 513, 533 (2000); *People v. Henderson*, 142 Ill. 2d 258, 323 (1990). A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error. *Runge*, 234 Ill. 2d at 142 (and cases cited therein).

¶ 84    Defendant contends that the prosecutor's two mischaracterizations were so prejudicial as to deny him a fair trial. Defendant argues that he was prejudiced because the evidence was so closely balanced that the mischaracterizations could have tipped the scales of justice against him. Defendant further argues that the two mischaracterizations were "not isolated, but worked together to exaggerate and misrepresent the scant physical evidence." According to defendant, "[t]he pervasive misconduct here created a pattern of unfairness that denied [defendant] a fair trial and requires reversal and remand for a new trial." We disagree.

¶ 85    Considering the closing argument in its entirety, each of the two challenged prosecutorial remarks was obviously a mischaracterization of an item of evidence. Defendant is correct that the prosecutor's remark that the blood from the bloodstain on defendant's jeans "matched" the blood of the victim was a mischaracterization. However, this was clearly an isolated remark that the prosecutor made between several correct references to the DNA evidence throughout the entirety of the argument.

¶ 86    Defendant is also correct that the prosecutor's remark that defendant's fingerprint on the victim's vehicle was a "fresh print" was a mischaracterization. However, this too was an isolated remark among several correct references to defendant's fingerprint.

¶ 87    We cannot accept defendant's description of these two isolated remarks as "pervasive misconduct" that "created a pattern of unfairness." The brief and isolated nature of these two mischaracterizations, in the context of the entire lengthy closing argument, is "a factor we have found significant in assessing the impact of such remarks on a jury verdict." *Runge*, 234 Ill. 2d at 142. As to another appropriate factor in our assessment, we note that the trial court instructed the jury to disregard statements made in closing argument not based on the evidence. See, *e.g.*, *id.* at 143; *People v. Moore*, 171 Ill. 2d 74, 100 (1996); *Henderson*, 142 Ill. 2d at 326.

¶ 88    Accordingly, forfeiture aside, the two challenged remarks were not so improper and so prejudicial that real justice was denied or that the jury's verdict may have resulted therefrom. Without reversible error, there can be no plain error. *Hood*, 2016 IL 118581, ¶ 29; *Harris*, 225 Ill. 2d at 24-25, 31-32; *People v. Sims*, 192 Ill. 2d 592, 623 (2000).


¶ 89                          2. Ineffective Assistance of Counsel

¶ 90    Defendant alternatively contends that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim. *Id.* at 697.

¶ 91 In this case, we can dispose of defendant's assertion of ineffective assistance of counsel on the prejudice prong alone. The showing of *Strickland* prejudice in this context is similar to the prejudice that establishes reversible error for improper prosecutorial remarks: whether the guilty verdict resulted from trial counsel's failure to object. *Perry*, 224 Ill. 2d at 347. We have concluded that the two challenged remarks were not sufficiently prejudicial to constitute reversible error. Therefore, trial counsel's failure to object cannot have caused the type of prejudice that *Strickland* requires. *Id.* at 350; *People v. Ceja*, 204 Ill. 2d 332, 358 (2003).

¶ 92                                                 C. *Krankel* Preliminary Inquiry

¶ 93 Defendant submitted, *pro se*, a letter to the trial court and made posttrial claims of ineffective assistance of counsel. The trial court eventually conducted a preliminary examination of defendant's ineffectiveness claims pursuant to *Krankel*, 102 Ill. 2d 181. The trial court denied defendant's claims without appointment of independent counsel and further hearing. The appellate court affirmed. 2018 IL App (5th) 150274, ¶¶ 81-122. Before this court, defendant assigns error as to how the trial court conducted the *Krankel* preliminary inquiry. Defendant seeks, pursuant to *Krankel*, the appointment of counsel for a hearing on the merits of his *pro se* ineffective assistance of counsel claim or, at least, a new *Krankel* preliminary inquiry.

¶ 94 In *Krankel*, the defendant filed a *pro se* posttrial motion for a new trial alleging ineffective assistance of counsel because his trial counsel failed to investigate or present an alibi defense. The trial court gave the defendant an opportunity to argue his motion. After hearing from the defendant, the trial court denied the defendant's *pro se* ineffectiveness claim. Before this court, the State conceded that the defendant should have had new counsel to represent him on the motion. We agreed and remanded the matter for a new hearing on the defendant's *pro se* motion with different counsel to determine whether the defendant was denied effective assistance of counsel. *Krankel*, 102 Ill. 2d at 187-89.

¶ 95 A common-law procedure has developed from our decision in *Krankel* that governs a *pro se* posttrial claim alleging ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34; *People v. Patrick*, 2011 IL 111666, ¶ 29; *People v. Williams*, 147 Ill. 2d 173, 250-51 (1991) (collecting cases). This procedure "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" (*Patrick*, 2011 IL 111666, ¶ 39) and "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal" (*id.* ¶ 41). See *Roddis*, 2020 IL 124352, ¶ 34; *People v. Jolly*, 2014 IL 117142, ¶¶ 29, 38.

¶ 96 The *Krankel* procedure "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *Jolly*, 2014 IL 117142, ¶ 29. A *pro se* defendant need only bring his or her claim to the trial court's attention. The defendant is not required to file a written motion in the trial court but may raise the issue orally or through a letter or note to the court. *People v. Ayres*, 2017 IL 120071, ¶ 11 (and cases cited therein).

¶ 97 An abundance of decisions from this court and our appellate court "have contributed to the refinement of the *Krankel* procedure." *Roddis*, 2020 IL 124352, ¶ 37. New counsel is not automatically appointed in every case when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. Rather, when a defendant makes such a claim, the trial court

should first examine its factual basis. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Jolly*, 2014 IL 117142, ¶ 29; *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003) (collecting cases). The new counsel would then represent the defendant at the hearing on the *pro se* claim of ineffective assistance of counsel. The appointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position. *Roddis*, 2020 IL 124352, ¶ 36; *Moore*, 207 Ill. 2d at 78.

¶ 98    The applicable standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* posttrial claims of ineffective assistance of counsel. 2018 IL App (5th) 150274, ¶ 86. "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78. Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. *Roddis*, 2020 IL 124352, ¶ 33; *Moore*, 207 Ill. 2d at 75. However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous. *People v. Lobdell*, 2019 IL App (3d) 180385, ¶ 10; *People v. Cook*, 2018 IL App (1st) 142134, ¶ 106; *People v. Smith*, 2016 IL App (1st) 140039, ¶ 14; *People v. Jackson*, 131 Ill. App. 3d 128, 139-40 (1985). Manifest error is error that is clearly evident, plain, and indisputable. *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 40; *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 99    Before this court, defendant contends that his *Krankel* proceeding was improper for three reasons. First, defendant contends that the trial court applied the wrong criteria in denying his *pro se* ineffectiveness claims at the conclusion of the *Krankel* preliminary inquiry. Second, defendant contends that the *Krankel* preliminary inquiry was conducted in an adversarial manner, which can never be deemed harmless error. Third, defendant alternatively contends that harmless error review is inappropriate in this particular case.

¶ 100                    1. Allegedly Incorrect Criteria

¶ 101    Defendant contends that the trial court applied the wrong guideline in denying his *pro se* ineffectiveness claims at the conclusion of the *Krankel* preliminary inquiry. The test to be applied at a *Krankel* preliminary inquiry is familiar. " ' "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." ' " *Ayres*, 2017 IL 120071, ¶ 11 (quoting *Jolly*, 2014 IL 117142, ¶ 29, quoting *Moore*, 207 Ill. 2d at 78); accord *Roddis*, 2020 IL 124352, ¶ 35.

¶ 102    At defendant's *Krankel* preliminary examination, the trial court asked defendant to elaborate on his ineffectiveness claims. After defendant elaborated on each claim, the trial court asked defense counsel to respond.

¶ 103    Defendant claimed that defense counsel was ineffective for failing to call Laqueshia Jackson as a witness at his second trial. Defendant maintained that Jackson recanted her

- 15 -

inculpatory testimony from the first trial. In response, defense counsel explained that Jackson gave him a statement recanting her prior inculpatory testimony but that he did not call her based on trial strategy due to uncertainty as to what she might say on the witness stand. Defendant next claimed that defense counsel was ineffective for failing to call Jackson's sister, Angela Dodd, as a witness. In response, defense counsel explained that his only memory of Dodd was speaking with her to locate Jackson. Defendant claimed that defense counsel was ineffective for failing to call two alibi witnesses. Defense counsel responded that he was unable to locate one witness and decided not to call the other based on trial strategy. Defendant claimed that defense counsel was ineffective for failing to object to the two earlier-discussed prosecution mischaracterizations during closing argument. Defense counsel responded that he did not believe the mischaracterizations were improper. Defendant also claimed that defense counsel was ineffective for failing to present evidence concerning the unreliability of the State's DNA evidence. Defense counsel responded that he made the strategic decision to argue that the evidence failed to prove that defendant was ever inside the victim's car because he could have picked up the bloodstain from blood that was found on the exterior of the car.

¶ 104    In this case, defendant argues that he triggered the appointment of new counsel for a hearing on his *pro se* ineffectiveness claims by showing a possible neglect of his case by defense counsel. However, according to defendant, the trial court "erroneously applied a higher standard and required Jackson to show his counsel's ineffectiveness at this hearing."

¶ 105    This argument is foreclosed by our recent decision in *Roddis*, 2020 IL 124352. In *Roddis* we observed as follows:

"The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect. The court can 'base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " *Id.* ¶ 56 (quoting *Moore*, 207 Ill. 2d at 79).

We held that, "even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel. This serves both the ends of justice and judicial economy." (Emphasis in original.) *Id.* ¶ 61.

¶ 106    In the case at bar, the trial court found that "[t]he sufficiency of the allegations made by the defendant fail on their face to substantiate a claim of ineffective assistance of counsel." We agree. Defendant claimed that defense counsel was ineffective by not calling Jackson and Dodd to testify, by failing to challenge the State's DNA evidence, and by not objecting to the two mischaracterizations in the State's closing argument. "Whether to call certain witnesses and whether to present an alibi defense are matters of trial strategy, generally reserved to the discretion of trial counsel." *People v. Kidd*, 175 Ill. 2d 1, 45 (1996). Also, generally, "trial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991); see *People v. Leger*, 149 Ill. 2d 355, 396-97 (1992). Because each of these allegations relates to trial strategy, it cannot serve as the basis of a *Krankel* claim. See, *e.g.*, *People v. Chapman*, 194 Ill. 2d 186, 230-31 (2000); *Kidd*, 175 Ill. 2d at 44-45; *People v. Strickland*, 154 Ill. 2d 489, 526-30 (1992). We hold that the trial court did

not manifestly err when it denied defendant's *pro se* posttrial motion alleging ineffective assistance of counsel without appointing new counsel and conducting a hearing pursuant to *Krankel*.

¶ 107                    2. Availability of Harmless Error Review

¶ 108    Defendant also contends that the trial court allowed the State to participate in an adversarial manner at the *Krankel* preliminary inquiry. Defendant argues that this error is not subject to harmless error review.

¶ 109    As earlier stated, defendant elaborated on each claim, to which defense counsel offered a response. After defendant and defense counsel finished this dialogue, the trial court asked the prosecutor: "[D]o you want to comment on any of that?" The prosecutor argued that defendant's *pro se* ineffectiveness claims related to trial strategy and evidentiary issues and that defense counsel presented "an excellent defense" for defendant. The prosecutor asked the trial court "to make a finding that based upon this initial review, that there has been nothing presented that is—that additional counsel needs to be presented." As earlier discussed, the trial court denied defendant's claims of ineffective assistance of counsel without appointing independent counsel and further hearing pursuant to *Krankel*.

¶ 110    It is established that during the *Krankel* preliminary inquiry, some interchange between the trial court and defendant's trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on the defendant's claim. The trial court may inquire of trial counsel about the defendant's *pro se* allegations, and the court may briefly discuss the allegations with the defendant. Also, the trial court may base its determination on its knowledge of defense counsel's performance at trial and the facial insufficiency of the defendant's allegations. *Ayres*, 2017 IL 120071, ¶ 12; *Jolly*, 2014 IL 117142, ¶ 30; *Moore*, 207 Ill. 2d at 78-79.

¶ 111    Relying on this court's decision in *Jolly*, 2014 IL 117142, defendant contends that the State's adversarial participation in the *Krankel* preliminary inquiry rendered it erroneous. During the *Krankel* inquiry in *Jolly*, the trial court allowed the defendant to explain each of his claims of ineffective assistance but repeatedly stopped the defendant from presenting argument on his claims. *Id.* ¶ 18. The court then offered the State the opportunity to "rebut" the defendant's claims. The State accepted the court's offer and called the defendant's trial counsel as a witness. *Id.* ¶ 19. The State subjected defense counsel to lengthy questioning on the defendant's claims that he was ineffective. Through the examination, defense counsel generally rebutted and otherwise denied the defendant's ineffectiveness claims. After the State questioned defense counsel, the trial court did so. *Id.* ¶ 20. The court allowed both the *pro se* defendant and the State to present brief arguments. *Id.* ¶ 21. Finding that the defendant's allegations lacked merit or pertained to trial strategy, the trial court ruled that it would not appoint new counsel or proceed to a full evidentiary hearing. *Id.* ¶ 22. On appeal, the State conceded before this court that the trial court erred in permitting the State's adversarial participation. However, the State argued that the improper procedure constituted harmless error. *Id.* ¶ 27.

¶ 112    The *Jolly* court disapproved of the management of that *Krankel* hearing. We maintained that the common-law *Krankel* procedure is intended to address fully a defendant's *pro se*

posttrial ineffectiveness claims against trial counsel and thus potentially limit issues on appeal. Also, by initially evaluating a defendant's claims in a *Krankel* preliminary inquiry, the trial court will create the necessary record for any claims raised on appeal. *Id.* ¶ 38. We held:

> "For these reasons, we believe that a preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding. Because a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the State's participation at that proceeding, if any, be *de minimis*. Certainly, the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry." *Id.*

We reasoned:

> "[T]he purpose of *Krankel* is best served by having a neutral trier of fact initially evaluate the claims at the preliminary *Krankel* inquiry without the State's adversarial participation, creating an objective record for review. This goal, however, is circumvented when the circuit court essentially allows the State to bias the record against a *pro se* defendant during the preliminary *Krankel* inquiry. A record produced at a preliminary *Krankel* inquiry with one-sided adversarial testing cannot reveal, in an objective and neutral fashion, whether the circuit court properly decided that a defendant is not entitled to new counsel." *Id.* ¶ 39.

We held that the State's adversarial participation in that *Krankel* preliminary inquiry was "contrary to the intent of a preliminary *Krankel* inquiry." *Id.* ¶ 40.

¶ 113   Generally, the erroneous failure to appoint new counsel to argue a defendant's *pro se* posttrial ineffectiveness claim following a proper *Krankel* preliminary inquiry can be harmless beyond a reasonable doubt. *Id.* ¶¶ 42-43 (citing *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991)); *Moore*, 207 Ill. 2d at 80-81 (collecting cases). In *Jolly*, this court explained that in *Nitz* there was no concern with the adequacy of the record from the *Krankel* preliminary inquiry. *Jolly*, 2014 IL 117142, ¶ 44. However, in *Jolly*, we could not conclude that the State's adversarial participation in that *Krankel* preliminary inquiry constituted harmless error based on the lack of an objective and neutral record. *Id.* ¶¶ 39-40. In *Jolly*, this court explicitly recognized the State's concern that our decision would "constitute a new type of reversible structural error." *Id.* ¶ 45. We expressly stated: "The State's concern is unfounded." *Id.* We specifically refused to "find that the State's improper adversarial participation in a preliminary *Krankel* hearing was structural error." *Id.*

¶ 114   In the case at bar, we agree with defendant that the trial court erred by permitting the State's adversarial participation in his *Krankel* preliminary hearing. The State's participation consisted of more than a few passing remarks and was not *de minimis*. Rather, the prosecutor presented argument in opposition to defendant's claim of ineffective assistance of trial counsel and actually asked the trial court to deny defendant's *Krankel* motion. By complimenting defense counsel's trial performance, the prosecutor advanced the appearance of the State and defense counsel aligned against defendant, who was acting *pro se* at this proceeding. Also, the fact that the State's argument responded to all of defendant's ineffectiveness claims at the end of the *Krankel* preliminary inquiry, rather than responding sequentially to each claim, does not reduce the State's adversarial participation to a *de minimis* degree. We observe that the appellate court agreed with our conclusion that the trial court erred by permitting the State's adversarial participation in defendant's *Krankel* preliminary inquiry. 2018 IL App (5th) 150274, ¶¶ 88-92.

¶ 115    However, the appellate court further held that the improper *Krankel* preliminary inquiry constituted harmless error under the facts and circumstances of this case. *Id.* ¶¶ 102-04. Before this court, defendant argues that the State's adversarial participation in a *Krankel* preliminary inquiry is not subject to harmless error review and can never be deemed harmless error.

¶ 116    The State initially responds that defendant forfeited this specific argument because he did not raise it in the appellate court. Defendant's appellate court briefs indicate that defendant is presenting a new argument before this court. In his appellant's brief, defendant contended that the *Krankel* preliminary inquiry was erroneous because of the State's adversarial participation. In its appellee's brief, the State simply denied that the prosecutor's participation in the *Krankel* preliminary inquiry was adversarial. In his reply brief, defendant first raised the issue of harmless error in the appellate court and plainly limited his harmless error argument to the facts of this case. He actually argued: "Here, the nature of Jackson's claims, that his attorney failed to call witnesses and challenge trial evidence, cannot be reviewed as harmless error on this record, which was obtained with the adversarial participation of the State." Indeed, citing paragraph 45 of *Jolly*, defendant expressly acknowledged that this court in *Jolly* "found that the State's adversarial input was subject to harmless-error review."

¶ 117    Therefore, defendant's argument before this court, that the State's adversarial participation in a *Krankel* preliminary inquiry is not subject to harmless error review and can never be deemed harmless error, was not raised by defendant in the appellate court. Issues raised for the first time in this court are forfeited. *People v. Cherry*, 2016 IL 118728, ¶ 30; *People v. Washington*, 2012 IL 110283, ¶ 62; *People ex rel. Waller v. 1989 Ford 350 Truck*, 162 Ill. 2d 78, 90-91 (1994).

¶ 118    However, this rule is an admonition to the parties and not a limitation on a court of review. Reviewing courts may look beyond considerations of forfeiture to maintain a sound and uniform body of precedent or where the interests of justice so require. *Halpin v. Schultz*, 234 Ill. 2d 381, 390 (2009); *Barnett v. Zion Park District*, 171 Ill. 2d 378, 389 (1996). A conflict exists within the appellate court as to whether the State's adversarial participation in a *Krankel* preliminary inquiry is subject to harmless error review and can ever be deemed harmless error. Accordingly, we choose to address the issue at this time. See *People v. Wendt*, 163 Ill. 2d 346, 351 (1994).

¶ 119    Relying on *Jolly*, defendant argues that the State's adversarial participation in a *Krankel* preliminary inquiry precludes harmless error review because this type of error results in "an unreliable record which cannot be examined to determine if it is harmless" and "will never produce the type of neutral record required for harmless error review." We disagree.

¶ 120    We earlier observed that this court in *Jolly* specifically declined to find that the State's improper adversarial participation in a *Krankel* preliminary inquiry was structural error. *Jolly*, 2014 IL 117142, ¶ 45. "An error is typically designated as 'structural' and requiring automatic reversal only if it necessarily renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence." *People v. Averett*, 237 Ill. 2d 1, 12-13 (2010). "Structural errors are not subject to harmless-error review." *Id.* at 14. Conversely, where an error does not rise to the level of structural error, then it does not require automatic reversal and is amenable to harmless error review. See *People v. Glasper*, 234 Ill. 2d 173, 199-200 (2009); *Neder v. United States*, 527 U.S. 1, 7 (1999) (holding that errors that are not structural are amenable to harmless error analysis). In *Jolly*, when this court specifically refused to hold that the State's

adversarial participation in a *Krankel* preliminary hearing was structural error, we necessarily concluded that the error does not require automatic reversal and is amenable to harmless error review.

¶ 121 In *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 27, a panel of our appellate court recognized that the trial court erroneously conducted the *Krankel* preliminary inquiry in that case in an adversarial manner. However, the *Skillom* court observed that "the supreme court specifically declined to hold that the error in that case [*Jolly*] constituted structural error. *Jolly*, 2014 IL 117142, ¶ 45." *Id.* ¶ 28. Therefore, the *Skillom* court applied harmless error review to that *Krankel* preliminary inquiry. *Id.* The *Skillom* court concluded that the error committed during that inquiry was harmless. *Id.* ¶¶ 29-30.

¶ 122 However, in *People v. Gore*, 2018 IL App (3d) 150627, a different panel of our appellate court reached the opposite conclusion. In that case, the State argued that its adversarial participation in that *Krankel* preliminary inquiry was harmless error. The *Gore* court reasoned: "That argument, however, is foreclosed by the decision in *Jolly*, in which our supreme court rejected the notion that a *Krankel* inquiry conducted in adversarial fashion could be considered harmless error." *Id.* ¶ 39. Although the *Gore* court cited *Jolly*, it failed to refer to paragraph 45 of *Jolly*, in which we refused to find this type of error to be structural error, thereby rendering it amenable to harmless error review. *Id.* To the extent that *People v. Gore*, 2018 IL App (3d) 150627, holds that the State's erroneous adversarial participation in a *Krankel* preliminary inquiry can never be considered harmless error, that decision is hereby overruled.

¶ 123                    3. Appropriateness of Harmless Error Review in This Case

¶ 124 Defendant alternatively contends that harmless error review is inappropriate in this particular case. Defendant argues that an objective and neutral record of the *Krankel* preliminary inquiry is unavailable in this case because the proceeding was tainted by the State's adversarial participation and because defendant's trial counsel actively argued against defendant's claims. We disagree. Although the *Krankel* preliminary inquiry here was erroneously conducted by the trial court, it nevertheless produced a neutral and objective record with which a reviewing court can assess defendant's *pro se* ineffectiveness claims.

¶ 125 Defendant argues that his trial counsel "did not merely make statements about the facts and circumstances, [rather] he actively argued against [defendant]." The record refutes this argument. The trial court, assisted by defense counsel, created an objective record of the facts and circumstances relating to defendant's *pro se* ineffectiveness claims. Defendant points to one comment. Defendant claimed ineffectiveness because trial counsel failed to challenge the weakness of the State's DNA evidence. Defendant contends that his trial counsel argued against him by responding that defendant's fingerprint was on the outside of the car. However, this was an objectively true statement to explain for the record why defense counsel made this strategic decision.

¶ 126 Further, defendant argues that his *Krankel* preliminary inquiry "was tainted by the State's adversarial participation." We disagree. We have already concluded that the prosecutor's remarks constituted erroneous adversarial participation. However, the trial court's error occurred after the trial court allowed defendant to present all of his ineffectiveness claims and confirmed that defendant had nothing else he wanted to say. Further, in contrast to *Jolly*, the prosecution here did not introduce evidence, cross-examine defendant or his trial counsel, or

otherwise create, much less distort, the record in any way. Rather, the prosecutor erroneously commented at the end of the hearing on the already existing objective record. Although the prosecutor's comments were erroneous, they cannot be said to have distorted the instant record or to have made it impossible for a reviewing court to consider whether defendant was entitled to new counsel and a hearing on his ineffectiveness claims. In sum, neither the challenged remarks of defendant's trial counsel nor the trial court error of permitting the State's adversarial participation in defendant's *Krankel* preliminary inquiry prevented the trial court from creating an objective record for us to review.

¶ 127    To establish that any error was harmless, the State must prove beyond a reasonable doubt that the result would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003); *People v. Warmack*, 83 Ill. 2d 112, 128-29 (1980). We earlier held that defendant's ineffectiveness claims, as presented on the neutral and objective record, pertain to trial strategy and, therefore, cannot serve as the basis of a *Krankel* request. After reviewing the record of defendant's *Krankel* preliminary inquiry, we conclude that the trial court would have reached the same result absent the error. Therefore, we hold that the erroneous manner in which the proceeding was conducted was harmless beyond a reasonable doubt.

¶ 128                                    III. CONCLUSION

¶ 129    In sum, we hold as follows. The evidence was sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt. The two challenged prosecutorial mischaracterizations during closing argument did not constitute reversible error. The trial court did not manifestly err in denying defendant's request for the appointment of new counsel and further hearing on his *pro se* ineffective assistance of counsel claims pursuant to *Krankel*. Lastly, although the trial court erred when it permitted the State's participation in the *Krankel* preliminary inquiry, it constituted harmless error because the trial court's denial of defendant's *pro se* ineffectiveness claim would have been the same absent the error. Therefore, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 130    Affirmed.

¶ 131    JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.