NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230229-U

NO. 4-23-0229

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 18, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Livingston County |
| DANGELO A. WILLIAMS, | ) | No. 22CF181 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

---

JUSTICE ZENOFF delivered the judgment of the court.
Justice Knecht concurred in the judgment.
Justice Doherty specially concurred.

**ORDER**

¶ 1 *Held*: The appellate court affirmed defendant's conviction of unlawful possession of between 100 and 400 grams of a substance containing methamphetamine with intent to deliver, as the prosecutor's closing argument was proper. The appellate court vacated defendant's sentence and remanded for a new sentencing hearing because the trial court improperly considered an aggravating factor that is inherent in the offense.

¶ 2 A Livingston County jury found defendant guilty under an accountability theory of unlawful possession of between 100 and 400 grams of a substance containing methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2022)). The trial court sentenced defendant to 18 years in prison. Defendant appeals, arguing that the prosecutor made improper remarks during closing argument and the court considered improper sentencing factors. We affirm defendant's conviction but vacate the sentence and remand for a new sentencing hearing.

¶ 3         I. BACKGROUND

¶ 4 We will include additional facts in the analysis section as necessary to address the specific issues defendant raises on appeal.

¶ 5 On August 18, 2022, the State charged defendant by information with unlawful possession of between 100 and 400 grams of a substance containing methamphetamine with intent to deliver. The State also charged defendant with the lesser-included offense of simple possession (720 ILCS 646/60(a) (West 2022)).

¶ 6 A. The Trial Evidence

¶ 7 The matter proceeded to a jury trial. Sergeant Jason Clift of the Streator Police Department testified as follows. He was a member of the Trident Drug Task Force, which operated in multiple counties. In August 2022, Clift communicated by text message with a person he presumed was Jerome Alexander to purchase nine ounces of methamphetamine for $3375. The transaction was to occur in a Dollar General store parking lot in Streator, Illinois. The plan was for Clift to purchase the drugs and then for other police officers in nearby unmarked vehicles to make arrests immediately.

¶ 8 Clift testified that a car pulled up next to his at the Dollar General, and he received a text message to get in that car. He tried to get in the front passenger seat, but the door was locked. Clift saw that the driver of the car was Alexander, and a person Clift identified in court as defendant was in the front passenger seat. Somebody cracked the widow and told Clift to get in the back seat of the car, which he did. Clift initially interacted solely with Alexander with respect to the drug transaction. However, according to Clift, it did not seem defendant "was at all surprised" about the transaction. For example, defendant did not ask who Clift was or what he wanted. Defendant did not seem surprised Clift had a lot of money with him.

¶ 9        According to Clift, Alexander tried to hand him marijuana and wanted him to smoke it. Clift responded that he did not smoke marijuana. Alexander asked Clift whether he did methamphetamine, and Clift said he sometimes did. Alexander asked Clift whether he smoked or snorted it. Clift replied that he usually smoked it, but he snorted once in a while. Alexander then tried to get Clift to snort the methamphetamine. Defendant likewise said Clift should "hit the methamphetamine." Deflecting these requests, Clift responded he was trying to weigh the methamphetamine with a scale on his lap that he brought with him. Defendant again told Clift to "hit" the methamphetamine. Clift said, "here, just count the money; I've got the money." Defendant said, "we know you got the money." As Clift was trying to weigh the methamphetamine, he handed money to Alexander. Clift asked whether he could purchase the same amount of methamphetamine next week, and Alexander said, "yes."

¶ 10       Clift testified that he then exited Alexander's car, which was a signal for other police officers to make arrests. As officers approached the car yelling, "police, step out of the vehicle," Alexander reversed into another vehicle multiple times, jumped a curb, drove through a fence, and drove away. Police officers later located Alexander's abandoned car. At least half an hour after the drug transaction, and three to four miles away from the Dollar General, Clift found defendant. According to Clift, defendant had been running, had one shoe on, and was a little wet from having crossed the Vermilion River. Clift then arrested defendant without further incident. Police officers never located Alexander.

¶ 11       On cross-examination, Clift testified that when he entered Alexander's car, the methamphetamine was already in the back seat. Clift did not see defendant touch the methamphetamine, and defendant did not have any marked currency on him when he was arrested. Prior to the transaction, Clift was not aware that defendant was going to be present.

¶ 12         By stipulation, the trial court admitted a laboratory report indicating that a scientist tested 171.6 grams of the substance Clift purchased, which was determined to contain methamphetamine. The scientist did not test the other 88.6 grams of the substance Clift purchased.

¶ 13         Inspector Samer Assaf of the Livingston County Sheriff's Office also testified for the State. He was one of the officers who was supposed to make arrests on Clift's signal. Assaf corroborated Clift's testimony about Alexander driving away from the Dollar General.

¶ 14         Assaf interviewed defendant a couple of days after his arrest. An approximately 20-minute recording including portions of this interview was admitted into evidence and played for the jury. This court has reviewed the video. Although the sound quality is subpar, we discerned the following. Defendant said Alexander suggested driving with him to Indiana, and they stopped at a Dollar General. Defendant said he knew it was a "setup" when he saw the "white dude," which is why he tried to get that man to "hit the weed" and told Alexander to "count the money." Defendant knew the man was a police officer because his shoes were too clean. When Assaf asked defendant where Alexander kept the "ice" (which Assaf testified was slang for methamphetamine), defendant responded, "on his side pocket." Assaf asked defendant whether Alexander "push[ed] a lot" and tried to "push anything he can." Seemingly responding in the affirmative, defendant told Assaf that the "ice" was why Alexander no longer worked. Defendant said that he personally did not "deal with" ice.

¶ 15         Assaf and defendant later had the following exchange, which we will transcribe as closely as we can:

              "[ASSAF:] Now uh, before—before you guys, uh, came over here, I know you guys stopped by the Taft house, you know, out there in Peoria.

- 4 -

[DEFENDANT:] Yeah. Ok, ok, ok. Yeah, 'cuz he [(presumably Alexander)] probably texted you and told you that s***.

[ASSAF:] That, that's where he picked up the ice, right?

[DEFENDANT:] Ooooh.

[ASSAF:] I aint gonna lie.

[DEFENDANT:] I'm glad you smart.

[ASSAF:] I, I know.

[DEFENDANT:] I'm glad you smart.

[ASSAF:] I was gonna say man, you know.

[DEFENDANT:] [Indistinguishable.] He grabbed more. [Indistinguishable], listen.

[ASSAF:] Ok.

[DEFENDANT:] When I was sitting in my room I was sitting there thinkin' like, d***, if they were so smart, we could hit a double bump. 'Cuz 9 times out of 10, bro, he gone already, he back in the P."

Defendant then told Assaf about two places Alexander might be now, one of which was a "dope spot" at an apartment on Washington Street at the Taft house, where Alexander held drugs. Later in the interview, defendant said he did not see the "ice" in Alexander's car, as it was in "weed bags." Defendant reiterated he knew it was a police "setup." Defendant seemingly acknowledged directing Alexander where to drive after Alexander left the Dollar General parking lot and fled the police.

¶ 16       On direct examination, the prosecutor asked Assaf about his discussion with defendant about the "Taft houses." Assaf explained that a narcotics unit from Peoria had been

"tailing that vehicle prior to them coming to us to conduct that drug deal." Assaf was "in communication with the Peoria drug unit" "when this vehicle was moving." According to Assaf, the "Taft Homes" was a housing project in Peoria. Assaf testified that although he was not "there for it," he had guessed the methamphetamine "came from that area."

¶ 17      On cross-examination, Assaf acknowledged that during the interview, defendant (1) never admitted he sold methamphetamine, (2) said he "doesn't really mess with ice," and (3) claimed he did not know that Alexander "had ice until the deal was happening." However, Assaf added that defendant "also knew where the ice was prior to the deal," but defendant "indicated he didn't know that that was ice because it was in weed bags."

¶ 18      On redirect examination, Assaf testified that defendant confirmed during the interview that the methamphetamine "came from the Taft housing project." According to Assaf, defendant "knew exactly where" Alexander had placed the methamphetamine on the drive to the deal—*i.e*., in "the side pocket."

¶ 19      Detective Tyler Rafferty of the Fairbury Police Department also testified for the State. He identified body camera footage, which was shown to the jury, depicting Alexander's vehicle leaving the scene of the Dollar General as police officers converged to make arrests.

¶ 20      Defendant testified as follows on his own behalf. He lived in Peoria his entire life, and he had been good friends with Alexander for seven years. On August 17, 2022, Alexander planned to drive defendant to Indiana to see a friend. They went to a gas station to buy cigarettes and then proceeded on the highway. About 30 or 45 minutes into the drive, Alexander asked defendant whether he wanted to get snacks. Defendant responded in the affirmative, as they were high from marijuana. Alexander told him to "type in the nearest Dollar General." The closest

Dollar General was half an hour away from where they were at the time, and Alexander drove there.

¶ 21    According to defendant, when they got to the Dollar General parking lot, Alexander told him to "hold on" before going inside the store. A "big white guy" then knocked on the car window. Defendant rolled down the window, told the man to get in the back, and pulled up his seat so the man could fit in the car. Prior to the man getting in the car, defendant did not know there was methamphetamine in the car. As Alexander and the man were "doing whatever they [were] doing," defendant handed Alexander a "blunt" upon request. Defendant asked Alexander whether he wanted him to go inside the store. Alexander responded that defendant could remain in the car.

¶ 22    Defendant testified he heard the man who got in the car say, "[Y]ou got that for me?" Alexander responded, "yeah," and said it was "back there" (*i.e.*, in the back seat of the car). The man handed Alexander money and asked to weigh a substance that defendant at first thought was marijuana. Alexander then told the man to "hit" some marijuana, but the man did not do so. Defendant "snatched the blunt" from Alexander and took a hit. The man in the car then said, "let me steal it." Defendant told the man to "hit" the marijuana. The man responded that he "snort[ed] ice" but did not "smoke weed." Defendant then told the man to "snort the ice," but the man declined. Defendant again asked the man to "smoke this weed." Defendant never received any money that the man gave to Alexander. Defendant acknowledged he had a 2016 felony conviction for possessing a controlled substance.

¶ 23    On cross-examination, defendant clarified he used Alexander's phone to locate the nearest Dollar General to get snacks. The reason defendant told the man who knocked on the car window to get in the back seat was because Alexander told him to say that. There were multiple

"blunts" in the car, and defendant acknowledged trying to get a person he now knows was a police officer to smoke marijuana. Defendant denied knowing how the methamphetamine got in the back seat of Alexander's car. Defendant also denied telling Assaf the methamphetamine was in the "side pocket." Rather, he claimed he told Assaf he was "pretty sure like any other buy keep it in the side pocket." Defendant acknowledged giving Alexander directions about "how to get on the streets" once Alexander drove the vehicle away from the Dollar General. The reason defendant did so was because he did not want to "go back to jail" for something he had nothing to do with.

¶ 24                    B. Closing Arguments and Verdict

¶ 25        In closing argument, the prosecutor argued as follows. Defendant was involved with this drug transaction before it occurred. Defendant testified he "set[ ] the address for the Dollar General in Streator," yet he also claimed he was "completely surprised by the drug transaction having occurred." It did not make sense that defendant "randomly chose the correct Dollar General to put into the GPS" where a police officer was "waiting with cash to buy drugs." Throughout his interview, defendant tried to "push it all" on Alexander. Although Alexander "certainly *** is guilty," the fact that Alexander had not yet been convicted of the crime did not prevent the jury from convicting defendant under an accountability theory. To that end, the jury would receive an instruction allowing defendant to "be legally responsible for that conduct because he is someone that was located that day."

¶ 26        The prosecutor continued:

"A person is legally responsible for the conduct of another person when either before or during the commission of an offense[,] and with the intent to promote or facilitate the commission of an offense[,] he knowingly solicits, aids,

- 8 -

abets, agrees to aid or attempts to aid the other person in the planning or the commission of the offense." Defendant's testimony showed "his object and his intent in giving [Alexander] advice on how to get out of there was so they could both escape" and defendant could avoid returning to jail. Rhetorically asking why defendant would "want to do that," the prosecutor proposed it was "because he's legally responsible for the conduct of *** Alexander inarguably at that point, inarguably because at that point the drug deal had already occurred." Clearly and "[i]narguably," defendant could not say he lacked knowledge of the methamphetamine at the time he was giving "Alexander advice on how to flee the jurisdiction."

¶ 27   The prosecutor explained that the State's position was defendant "knew it was meth all along." The prosecutor then referenced the exchange between defendant and Assaf in the recorded interview regarding the "Taft housing project":

> "As Inspector Assaf is indicating to the Defendant that he figures the methamphetamine came from the Taft housing project, the Defendant stands up, leans forward and says you are good; and he informs Inspector Assaf that he actually did guess correctly as to where the meth came from, from the Taft housing project."

The prosecutor then asserted "anything about them stopping by the Taft housing project to get the meth" was "[c]oincidentally missing" from defendant's testimony. Specifically, defendant's testimony omitted the "portion of his own statement to Inspector Assaf as to where this methamphetamine came from." Defendant's memory was also "convenient," in that he claimed to have "no clue how the methamphetamine could have moved from the side pocket" to the back seat

- 9 -

of Alexander's car. It was for the jury to determine defendant's credibility in light of his inconsistent statements at trial versus in his police interview.

¶ 28 The prosecutor reiterated it "[m]akes no sense" that defendant "had no idea a drug deal was going to occur." "Again, he randomly ends up at the correct Dollar General, of all the Dollar Generals across Central Illinois[,] where *** Clift is waiting." Defendant also told Assaf that as he and Alexander were driving, "his instincts were kicking in" that "it was a setup." The prosecutor questioned why defendant would think about a setup if he did not know a drug transaction was going to occur. The fact that defendant was "getting tripped up in his story" showed he was not credible.

¶ 29 The prosecutor then recited the elements of the offense of possession of methamphetamine with intent to deliver. He mentioned that a laboratory report in evidence showed that "171 grams of the crystalline substance was confirmed to contain methamphetamine." The prosecutor submitted that, for purposes of accountability, "[t]hroughout the controlled buy," defendant attempted to aid Alexander by (1) "trying to force" Clift to "snort methamphetamine or smoke weed" and (2) asking Alexander "to count the money." Although the prosecutor anticipated defense counsel would argue the evidence pointed to Alexander, the State's position was that Alexander was not innocent either.

¶ 30 The prosecutor concluded his closing argument by stating:

"What's important from the State's perspective is all the evidence that points to this Defendant's attempts to aid his buddy throughout, during and after the controlled buy occurred when this Defendant had clear knowledge of the methamphetamine. In that way he committed the offense himself; and I'd ask that you find him guilty."

¶ 31    In closing argument, defense counsel argued the State did not prove defendant guilty under an accountability theory. Defense counsel mentioned that (1) "[a]ll communication that took place was between" Alexander and Clift, (2) defendant was not the driver of the vehicle, (3) defendant did not hand drugs to Clift, (4) defendant did not receive any money from Clift, (5) defendant did not have marked currency in his possession when he was arrested, (6) defendant consistently maintained he did not know there was methamphetamine in the car until he saw it, and (7) Clift did not know in advance that defendant was going to be in Alexander's car during the drug transaction.

¶ 32    In rebuttal closing argument, the prosecutor asserted defendant's admission to navigating to the Dollar General store showed his involvement in the drug transaction. Although defense counsel suggested defendant "sat there quietly throughout the controlled buy, didn't know, didn't interact, didn't do anything," the evidence did not support that argument. The prosecutor again mentioned that defendant "actively did involve himself in the process" when Clift was weighing the methamphetamine. "So for the defense to say that [defendant is] only being punished for the activity of another man ignores the Defendant's own conduct throughout the process and again his conduct afterwards in trying to navigate away from the police, get away." Responding to defense counsel's point that defendant did not have marked currency in his possession when he was arrested, the prosecutor suggested defendant and Alexander may have gotten rid of the money as they tried to escape the police.

¶ 33    The jury found defendant guilty of both possession of methamphetamine with intent to deliver and simple possession.

¶ 34                        C. Sentencing

¶ 35 According to the presentence investigation report, defendant's history of juvenile delinquency included adjudications for aggravated battery causing great bodily harm, failure to report annually as a violent offender against youth, and residential burglary. As an adult, defendant had convictions in Illinois for unlawful possession of a controlled substance, unlawful possession of a weapon by a felon, criminal damage to property, and resisting a peace officer. Defendant also spent time in prison for unspecified federal charges.

¶ 36 At the sentencing hearing, the State offered no evidence in aggravation and defendant offered no evidence in mitigation. The prosecutor acknowledged defendant's charge of simple possession should merge into the conviction for possession with intent to deliver. The special Class X sentencing range was 9 to 40 years in prison. 720 ILCS 646/55(a)(2)(D) (West 2022). The prosecutor requested a 22-year prison sentence, whereas defendant requested a 9-year sentence. The trial court sentenced defendant to 18 years in prison.

¶ 37 Defendant subsequently filed a motion for a new trial and a motion to reconsider the sentence. He did not raise either of the issues he presents on appeal. The trial court denied these motions. Defendant filed a timely notice of appeal.

¶ 38                                II. ANALYSIS

¶ 39                       A. The Prosecutor's Closing Argument

¶ 40 Defendant contends certain statements in the prosecutor's closing argument misrepresented both the law of accountability and the evidence of the case. Defendant acknowledges he forfeited this issue. However, he argues that (1) we may review the issue pursuant to both prongs of the plain error doctrine and (2) defense counsel was ineffective for failing to object to the challenged remarks. The State responds that the remarks were proper and defendant has failed to establish either plain error or ineffective assistance of counsel.

¶ 41          "Generally, prosecutors have wide latitude in the content of their closing arguments." *People v. Jackson*, 2020 IL 124112, ¶ 82. It is proper for a prosecutor to comment on the evidence and reasonable inferences drawn therefrom, "even if the suggested inference reflects negatively on the defendant." *Jackson*, 2020 IL 124112, ¶ 82. However, a prosecutor may not misstate either the law or the facts of the case. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29. When evaluating the propriety of a closing argument, we must "consider the closing argument as a whole, rather than focusing on selected phrases or remarks." *Jackson*, 2020 IL 124112, ¶ 82.

¶ 42          To preserve the issue for appellate review, a defendant must contemporaneously object to the prosecutor's remark and then raise the issue again in a posttrial motion. *People v. Mudd*, 2022 IL 126830, ¶ 21. Recognizing his forfeiture, defendant invokes both prongs of the plain error doctrine. To obtain relief pursuant to the first prong of the plain error doctrine, a defendant "must show that the evidence was closely balanced and that the prosecutor's comments were 'clear or obvious' reversible error that changed the outcome of the trial." *Mudd*, 2022 IL 126830, ¶ 22. Commentary during closing argument constitutes reversible error "only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. To obtain relief pursuant to the second prong of the plain error doctrine, a defendant must show the prosecutor's erroneous comments were "serious enough to affect the fairness of the trial or to undermine the integrity of the judicial process." *Mudd*, 2022 IL 126830, ¶ 22. Our supreme court has cautioned that "comments in prosecutorial closing arguments will rarely constitute second-prong plain error because the vast majority of such comments generally do not undermine basic protections afforded to criminal defendants." *People v. Williams*, 2022 IL 126918, ¶ 56. Under

either prong of the plain error doctrine, it is incumbent on the defendant to "prove actual error." *Mudd*, 2022 IL 126830, ¶ 22.

¶ 43 Defendant first challenges the following portion of the prosecutor's closing argument:

> "Again, from the Defendant's own testimony today, his object and his intent in giving *** Alexander advice on how to get out of there was so they could both escape because why would he want to go back to jail? Why would he want to do that? Well, indeed. It's because he's legally responsible for the conduct of *** Alexander inarguably at that point, inarguably because at that point the drug deal had already occurred. Clearly he can't say he didn't know about the meth at that point when he's giving *** Alexander advice on how to flee the jurisdiction; and you all saw the video. Get to the highway. [Alexander], just go back the way we came and then joking with the officer if they had gotten to the highway they would have never caught them.
>
> Inarguably at that point the Defendant can't claim he didn't know it was meth."

According to defendant, the prosecutor misstated the law of accountability by asserting defendant was "inarguably" legally responsible for the offense because he aided Alexander's escape. Defendant emphasizes that accountability cannot be based solely on assisting someone who already committed the crime. Defendant proposes that "[t]he prosecutor's remarks were especially prejudicial ***, because the jury instructions, while legally accurate, did not define the phrase 'during the commission of the offense.' " Defendant maintains "[t]he prosecutor's repeated focus

on [defendant's] aid of Alexander's escape filled this void, thus undoubtedly implying that his escape was the final step in an ongoing crime."

¶ 44    We discern no error in the prosecutor's remarks. Immediately before these remarks, the prosecutor correctly told the jury:

> "A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or the commission of the offense."

Immediately after the remarks quoted in the preceding paragraph, the prosecutor said, "The State's position is that [defendant] knew it was meth all along." Later in his closing argument, the prosecutor contended defendant attempted to aid Alexander in selling methamphetamine both by asking Clift to consume drugs and by asking Alexander to count the money. The prosecutor concluded his closing argument by asserting the evidence showed defendant attempted to aid Alexander "throughout, during and after the controlled buy occurred[,] when this Defendant had clear knowledge of the methamphetamine."

¶ 45    Viewed in the context of the entire closing argument, the prosecutor was not asking the jury to find defendant accountable merely because he helped Alexander navigate away from the police after the drug transaction. Instead, the prosecutor's theory was defendant knew all along that Alexander possessed methamphetamine, and defendant attempted to assist Alexander in selling it. The prosecutor's use of the word "inarguably" functioned to emphasize that defendant knew he was accountable for Alexander's actions, which is why defendant testified he did not want to return to jail. The record does not support defendant's claim that the prosecutor's closing

- 15 -

argument misled the jury into believing the offense of possession of methamphetamine with intent to deliver was not concluded until after defendant and Alexander fled the scene. To that end, the prosecutor recited the elements of the charged offense, which did not include fleeing the scene of the drug transaction.

¶ 46     Defendant next contends the prosecutor "reiterated this startlingly inaccurate theory of [defendant's] accountability during rebuttal closing argument, maintaining that 'for the defense to say that he's only being punished for the activity of another man ignores [***] his conduct afterwards in trying to navigate away from the police, get away.' " (Asterisks original to defendant's brief.) The actual quote from the record is: "So for the defense to say that he's only being punished for the activity of another man ignores *the Defendant's own conduct throughout the process and again* his conduct afterwards in trying to navigate away from the police, get away." (Emphasis added.) In the context of the full quote, it is clear the prosecutor presented a legally valid theory of accountability. We acknowledge that defendant's appellate counsel accurately quoted the prosecutor in the statement of facts portion of the appellant's brief. Nevertheless, we remind counsel it is unacceptable to attempt to manipulate the record in the argument section of the brief by omitting language in quoting the prosecutor's rebuttal argument in order to manufacture an error.

¶ 47     Defendant further contends the prosecutor misled the jury regarding the law of accountability "by suggesting that [defendant] could be convicted in Alexander's place merely because [defendant] was apprehended." Defendant points out the prosecutor told the jury it would be instructed that "a person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person who is claimed

committed the offense has not been convicted." Defendant then notes the following remarks by the prosecutor:

> "So that's created for situations like this where clearly as we heard from multiple witnesses *** Alexander is still at large or wanted. He hasn't been apprehended. He hasn't had his trial. He has not been convicted. This allows [defendant] to still be legally responsible for that conduct because he is someone that was located that day."

We discern no error in these comments. We do not think it likely jurors would have understood the prosecutor to be urging them to find defendant guilty *just* because he was "located that day." In context, the prosecutor was correctly pointing out defendant could be held legally accountable despite the fact that Alexander was never located by the police. This comment could not have misled the jury about the law of accountability.

¶ 48 Defendant also argues the prosecutor misrepresented the statements defendant made to Assaf during the recorded police interview. Defendant focuses primarily on the prosecutor's comments that (1) defendant informed Assaf that Assaf correctly guessed the subject methamphetamine came from the Taft housing project and (2) defendant's testimony omitted mentioning where the methamphetamine came from or "anything about them stopping by the Taft housing project to get the meth." According to defendant, the recorded interview does not support the prosecutor's assertions on these points. As part of this broader argument, defendant further submits the prosecutor improperly elicited testimony about the Taft homes by asking leading questions of Assaf on matters of which Assaf had no personal knowledge. Defendant proposes "the State's underlying premise—that the methamphetamine delivered during the controlled buy was in fact procured from the Taft Homes—was never established at trial."

- 17 -

¶ 49     We determine the prosecutor's comments were based on reasonable inferences from the evidence presented. During the recorded police interview that was played for the jury, Assaf told defendant he knew "you guys stopped by the Taft house" in Peoria before coming "over here," and "[t]hat's where he [(presumably Alexander)] picked up the ice." Rather than denying Assaf's accusations, defendant leaned toward Assaf and said Assaf was "smart." Defendant then said, "He grabbed more," which reasonably could be interpreted as a statement that Alexander grabbed more drugs. Defendant then proceeded to tell Assaf about an apartment in Peoria where Alexander stored drugs. This interchange between Assaf and defendant provided a valid basis for the State to argue that defendant admitted he was present when Alexander procured the methamphetamine he later sold to Clift.

¶ 50     Assaf's trial testimony provided an additional justification for the prosecutor's characterization of the evidence. Assaf testified on direct examination that a "Peoria narcotics unit was tailing that vehicle prior to them coming to us to conduct that drug deal." Assaf confirmed he was in communication with the Peoria drug unit "when this vehicle was moving." According to Assaf, he "guess[ed] that the meth came from" the Taft homes, and he questioned defendant about this during the recorded interview. On cross-examination, Assaf acknowledged defendant told him he did not know Alexander had methamphetamine until the deal was occurring. However, Assaf added that defendant "also knew where the ice was prior to the deal." On redirect examination, the prosecutor asked Assaf, "I think what you were saying is he confirmed in your questioning that the meth came from the Taft housing project?" Assaf responded: "Correct. He knew exactly where [Alexander] had placed it on the drive to the deal." The prosecutor asked, "And he said in the side pocket?" Assaf replied, "Correct."

¶ 51    On appeal, defendant correctly notes some of the prosecutor's questions of Assaf were leading. However, had defense counsel raised such objection at trial, the prosecutor would have had the opportunity to simply rephrase the questions and elicit the same testimony. We also reject defendant's assertion that Assaf testified to matters outside of his personal knowledge. Assaf was a party to a conversation with defendant, and Assaf properly related his understanding of what was said during that conversation.

¶ 52    Based on the recorded interview and Assaf's trial testimony, the prosecutor's closing argument was rooted in reasonable inferences from the evidence. Accordingly, we discern no error in the prosecutor's closing argument. The absence of error defeats defendant's request for relief pursuant to the plain error doctrine. See *Mudd*, 2022 IL 126830, ¶ 22 (noting that a defendant "must prove actual error" as part of a claim pursuant to either prong of the plain error doctrine). For the same reasons, defendant's related claim of ineffective assistance of counsel also fails. See *Mudd*, 2022 IL 126830, ¶ 47 (rejecting an ineffective assistance claim where the defendant failed to show error in the prosecutor's rebuttal closing argument).

¶ 53                          B. Sentencing Claim

¶ 54    Defendant also argues the trial court erred at sentencing by (1) considering an aggravating factor that is inherent in the offense (the general harm methamphetamine poses to society) and (2) enhancing his sentence "based upon the arbitrary disdain for [him] as an outsider to the community." Defendant recognizes he failed to preserve his sentencing claim for review. He asks us to review his claim pursuant to both prongs of the plain error doctrine. He also argues his counsel was ineffective for failing to raise these issues below. The State responds that the court's comments at sentencing were proper and defendant failed to establish either plain error or ineffective assistance of counsel.

¶ 55    Typically, the first step in any plain error analysis is to determine whether there was a clear or obvious error. *People v. Hutt*, 2023 IL 128170, ¶ 29. Accordingly, we will consider whether defendant has met his initial burden to demonstrate that a clear or obvious error occurred.

¶ 56    Defendant contends the trial court applied an improper " 'double enhancement' " (*People v. McGath*, 2017 IL App (4th) 150608, ¶ 63 (quoting *People v. Phelps*, 211 Ill. 2d 1, 12 (2004))) by increasing his sentence based on an aggravating factor that is inherent in the offense. This issue arises frequently in drug cases, as "the potential danger to society from the amount of the drugs is inherent in the crime of possession with intent to deliver." *People v. Robinson*, 391 Ill. App. 3d 822, 844 (2009). The legislature has made this clear in the Methamphetamine Control and Community Protection Act:

> "The purpose of this Act is to reduce the damage that the manufacture, distribution, and use of methamphetamine are inflicting on children, families, communities, businesses, the economy, and the environment in Illinois. The General Assembly recognizes that methamphetamine is fundamentally different from other drugs regulated by the Illinois Controlled Substances Act because the harms relating to methamphetamine stem not only from the distribution and use of the drug, but also from the manufacture of the drug in this State. Because methamphetamine is not only distributed and used but also manufactured here, and because the manufacture of methamphetamine is extremely and uniquely harmful, the General Assembly finds that a separate Act is needed to address the manufacture, distribution, and use of methamphetamine in Illinois." 720 ILCS 646/5 (West 2022).

Recognizing the societal harm attendant to methamphetamine, the legislature allowed for enhanced Class X sentencing for offenders like defendant, who deliver very large amounts of the substance. 720 ILCS 646/55(a)(2)(D) (West 2022).

¶ 57　　　　The line between proper and improper commentary at sentencing regarding the harm drugs cause can be subtle. To be clear, "[i]t is not improper *per se* for a sentencing court to refer to the significant harm inflicted upon society by drug trafficking." *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993). For example, it is appropriate for a trial court to mention the harm caused by drugs in the contexts of assessing the nature and circumstances of the case (*McGath*, 2017 IL App (4th) 150608, ¶ 73) or highlighting "the specific degree of harm threatened by [the] defendant's actions" (*Robinson*, 391 Ill. App. 3d at 844). A court may also consider the fact that a defendant "delivered a quantity of drugs in excess of the minimum for that sentencing range." *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22. Additionally, it is proper for a court to reference the harm caused by drugs in the context of rejecting a defendant's argument that lack of harm is a mitigating sentencing factor. *People v. Solis*, 2019 IL App (4th) 170084, ¶¶ 9, 28.

¶ 58　　　　What a trial court may *not* do is to deem it an aggravating factor that the defendant's conduct caused or threatened a degree of harm that is inherent in the offense. "If a trial court intends to consider the societal harm defendant's conduct threatened to cause as an aggravating factor, the record must demonstrate that the conduct of the defendant had a greater propensity to cause harm than that which is merely inherent in the offense itself." *McCain*, 248 Ill. App. 3d at 852; see *People v. Glenn*, 363 Ill. App. 3d 170, 181 (2006) (remanding for a new sentencing hearing where "the trial court made an express finding that the harm threatened to others was an aggravating factor"); *People v. Corn*, 358 Ill. App. 3d 825, 827 (2005) (remanding for a new

sentencing hearing where the trial court found the amount of methamphetamine that could be produced from the anhydrous ammonia the defendant stole, and the resultant harm to the community, "was a serious threat that aggravated the defendant's criminal conduct"); *People v. Maxwell*, 167 Ill. App. 3d 849, 850 (1988) (remanding for a new sentencing hearing where the trial court found as an aggravating factor that the defendant's conduct caused or threatened serious harm).

¶ 59 Given the subtle distinction between permissible and impermissible sentencing remarks, more than 30 years ago, the Second District suggested that trial judges who intend to discuss the harm caused by drugs should "attempt to segregate such general commentary from the balancing of sentencing factors." *McCain*, 248 Ill. App. 3d at 852. This court has agreed with that suggestion. *McGath*, 2017 IL App (4th) 150608, ¶ 73.

¶ 60 We apply a "strong presumption" that the trial court "based its sentencing determination on proper legal reasoning," and a defendant must "affirmatively establish[ ] his or her sentence was based on improper considerations." *Solis*, 2019 IL App (4th) 170084, ¶ 26. We also "consider the record as a whole, rather than focusing on a few words or statements by the circuit court." *Solis*, 2019 IL App (4th) 170084, ¶ 26. Having carefully reviewed the record of the sentencing hearing, we determine the court improperly considered as an aggravating factor the general harm to society and the community that is inherent in defendant's offense.

¶ 61 The prosecutor argued deterrence was "a very strong factor here in the balance battle [*sic*] against the people who would bring these types of drugs not only to our streets but to our community in the first place." We deem this aspect of the prosecutor's argument proper, as the need for deterrence is a relevant aggravating sentencing factor (730 ILCS 5/5-5-3.2(a)(7) (West 2022)) and one of the recognized purposes of sentencing (*People v. Page*, 2022 IL App (4th)

210374, ¶ 52). However, the prosecutor later seemingly asked the trial court to consider as an aggravating factor matters that are inherent in the offense:

> "The crime here is one that would threaten harm to our community. The Defendant and his co-defendant who is still running from justice on this matter did bring a substance to our community that can cause harm, sometimes irreparable harm. Methamphetamine has almost completely taken over cocaine and heroin as at least by the number the most common type of substance that our law enforcement are dealing with and that our addicts in our community are being given. It's a very common type of drug in Livingston County. It's become a really big problem.
>
> This Defendant I would argue is also truly a bigger part of the problem. As was noted here in the trial, the amount of methamphetamine that was brought into the community is certainly not for personal use. It was a large amount that would obviously be intended for more than just the person who got it, in this case the investigator with the Trident Task Force."

Defendant faced sentencing for unlawfully possessing between 100 and 400 grams of a substance containing methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2022)). It is inherent in this offense that defendant intended to deliver a very large quantity of drugs that could not be for any single person's use. It is also inherent in the offense that these drugs could harm the community significantly. The legislature plainly took these matters into account when it set the sentencing range for this offense at 9 to 40 years. To the extent the prosecutor was asking the court to consider as an aggravating factor that these facts inherent in the offense showed "defendant's conduct caused or threatened serious harm" (730 ILCS 5/5-5-3.2(a)(1) (West 2022)), this was ill-advised.

¶ 62 Defense counsel did not point this out in her closing argument. Instead, counsel argued only that defendant should be given the minimum prison sentence because he was convicted under accountability principles and he maintained his innocence.

¶ 63 In explaining its ruling, the trial court started out by considering appropriate matters. For example, the court accurately noted this was a very serious offense, as the legislature made it nonprobationable. Addressing defense counsel's argument, the court also rejected the notion that defendant's guilt under accountability principles made the offense less serious. The court then made the following remarks:

> "You know, as the State has argued, this was a substantial amount of methamphetamine in our community; and it is disheartening for me and just for society in general I think as the State alluded to in their recommendation, you don't live here. You don't live in this community, yet you are involved in bringing this very toxic drug, methamphetamine, a humongous amount in terms of what we see in Livingston County. That's a lot of methamphetamine, and that methamphetamine will cause tremendous harm to the community. Many, many people will be touched by that. I suspect there would be overdoses, deaths, first responders having to be involved, police. I mean, that just creates a whole slew of other issues within the community."

We determine these comments were an appropriate consideration of the nature and circumstances of the offense. Notably, with these remarks, the court was not discussing the general harm attendant to drugs in the context of an aggravating sentencing factor. This was consistent with the appellate court's advice for trial judges to "attempt to segregate such general commentary from the balancing of sentencing factors." *McCain*, 248 Ill. App. 3d at 852.

¶ 64    The trial court then addressed the aggravating factors:

"I do think as the State has argued that deterrence is a very strong factor in this case, one of the strongest factors. I recognize that we are in the midst of an epidemic I would say in regards to the drug problem in not just our county but our state, our community, our country; and while I understand that in the grand scheme of things your involvement is small, it's big for this community; and the reality is what you did by your actions was contribute to that problem in Livingston County. You made the problem worse so you're not just an addict from Livingston County maybe doing a little trading off here and there with somebody that you are a friend of in the community to help each other I guess get high. That's one thing we see fairly regularly, but you are somebody that has no reason to be here. No reason to bring methamphetamine to this community. No reason to bring this amount of methamphetamine to the community.

So I think that a strong message needs to be sent that it's just not going to be tolerated. I don't care where you are from. Whether it's St. Louis, Chicago, Peoria, wherever it is, you are not bringing methamphetamine into this community, period.

So I do think deterrence was a strong message. There was clearly a threat of harm to others based upon the substance itself and the severity and consequences of using that substance, and I believe you were on parole at the time that this offense was committed. So those are all strong aggravating factors in the case as well as your prior record."

¶ 65 With these comments, the trial court intermingled commentary about the general harm attendant to drugs with its consideration of aggravating sentencing factors. Arguably, this was not improper to the extent the court confined its remarks to the need for deterrence. However, the court stepped into impermissible territory when it expressly said, immediately after discussing factors inherent in the offense, that it was a "strong aggravating factor[ ]" that "[t]here was clearly a threat of harm to others based upon the substance itself and the severity and consequences of using that substance." We can only interpret these comments as indicating the court found it an aggravating factor that defendant's "conduct caused or threatened serious harm" (730 ILCS 5/5-5-3.2(a)(1) (West 2022)), which is something inherent in the offense of delivering a substantial amount of methamphetamine. See 720 ILCS 646/5 (West 2022) (stating that the legislature's purpose for enacting the Methamphetamine Control and Community Protection Act was "to reduce the damage that the manufacture, distribution, and use of methamphetamine are inflicting on children, families, communities, businesses, the economy, and the environment in Illinois"). This distinguishes the matter from another recent case we addressed involving a similar issue. See *People v. Gross*, 2023 IL App (4th) 230063-U, ¶ 65 (deeming it notable that "the [trial] court did *not* say it considered as an aggravating factor that [the] defendant's conduct caused or threatened serious harm" (emphasis in original)). Moreover, the court here did not focus its discussion on the degree of harm defendant caused or threatened *vis-à-vis* the base level for the offense, for example, that he delivered more than the 100 grams of methamphetamine necessary to trigger the 9-to-40-year sentencing range. Under these circumstances, we determine the trial court committed a clear or obvious error by considering an improper aggravating sentencing factor.

¶ 66 We recognize that in *People v. Garcia*, 2018 IL App (4th) 170339, ¶ 41, this court said portions of the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 2012)) and the Illinois

Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2012)) indicated "the legislature clearly intended that the amount of drugs possessed or sold by a defendant should be an aggravating factor, so the rule against double enhancements does not apply." Here, however, defendant was convicted of violating the Methamphetamine Control and Community Protection Act (720 ILCS 646/1 *et seq.* (West 2022)), not either of the acts construed in *Garcia*. Additionally, unlike in *Garcia*, defendant's challenge is focused on comments the trial court made about the harm inherent in his offense, not just the quantity of drugs he possessed.

¶ 67            To obtain relief pursuant to the plain error doctrine, defendant must also show either that "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). We cannot say the evidence at the sentencing hearing was closely balanced, as defendant had a significant history of criminality as a juvenile and as an adult. As to the second prong of the plain error doctrine, we are mindful that a defendant does not meet his or her burden of persuasion merely by asserting that a purported sentencing error interfered with the " 'fundamental right to liberty.' " *McGath*, 2017 IL App (4th) 150608, ¶ 68. In other words, not every sentencing error implicates the second prong of the plain error doctrine. With that said, our supreme court has recognized that considering an improper sentencing factor may sometimes affect one's fundamental right to liberty. *People v. Martin*, 119 Ill. 2d 453, 458 (1988); see *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 50 (finding second prong plain error where the trial court improperly considered the defendant's refusal to cooperate with the presentence investigation). As explained in *Maggio*:

> " '[W]here it can be determined from the record that the weight placed on the
>
> improperly considered aggravating factor was so insignificant that it did not lead to

a greater sentence, remandment is not required.' [Citation.] The converse of this rule is remandment is required where reliance on the improper sentencing factor was significant and led to a greater sentence." *Maggio*, 2017 IL App (4th) 150287, ¶ 50 (quoting *People v. Bourke*, 96 Ill. 2d 327, 332 (1983)).

Here, we are convinced the subject error denied defendant a fair sentencing hearing. The court deemed it a "strong aggravating factor[ ]" that "[t]here was clearly a threat of harm to others based upon the substance itself and the severity and consequences of using that substance." Thus, the record compels the conclusion that the court placed significant weight on an aggravating factor that is inherent in the offense. See *Maggio*, 2017 IL App (4th) 150287, ¶ 50 (determining an improper factor "weighed heavily in the court's sentencing decision" where the trial court stated this factor was " 'significant *** and troubling' and 'a telling indication of [the] defendant's attitude' "). Additionally, defendant's 18-year sentence, though well below the maximum, was also 9 years more than the minimum. We vacate defendant's sentence and remand for a new sentencing hearing.

¶ 68    We briefly comment on some other points defendant makes in this section of his brief. Defendant contends resentencing is required for the additional reason that the trial court's comments evinced an "arbitrary disdain" for him as an "outsider to the community." We discern no indication the court sentenced defendant more harshly than it would have sentenced someone from Livingston County with a similar background who possessed the same amount of methamphetamine with intent to deliver. Indeed, in response to defendant's statement in allocution, at the end of its sentencing ruling, the court said: "I will tell you it doesn't matter if you are a young man from Peoria, a young man from Livingston County, or one of my children, I am going to sentence you to what I think is the right sentence given all of the relevant statutory

factors." Defendant also requests resentencing before a different judge. This relief is unnecessary, as we are confident the court will rely on proper sentencing factors on remand.

¶ 69                                    III. CONCLUSION

¶ 70        For the reasons stated, we affirm defendant's conviction but vacate his sentence. We remand the matter for resentencing.

¶ 71        Affirmed in part and vacated in part; cause remanded.

¶ 72        JUSTICE DOHERTY, specially concurring:

¶ 73        I concur with the majority opinion in all respects but one: the suggestion that defendant's counsel on appeal attempted to "manipulate" the record "to manufacture an error." *Supra*, ¶ 46. The two sentences of argument in defendant's brief at issue reflect an effort to show that a more thoroughly explored issue in the State's closing argument was again referenced in rebuttal. Because the entire quotation at issue was referenced in full in both of defendant's briefs, I do not agree that counsel has attempted to "manufacture" an error.