NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241173-U

NO. 4-24-1173

IN THE APPELLATE COURT

FILED
January 29, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| MICHAEL K. SMITH, | ) | No. 23CF427 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) no error occurred in the trial court's decision under the procedure in *People v. Krankel*, 102 Ill. 2d 181 (1984), not to appoint new counsel to assist defendant with his claim of ineffective assistance of counsel and (2) defendant's sentencing claim was forfeited and he failed to show either (a) plain error or (b) ineffective assistance of counsel.

¶ 2    Defendant, Michael K. Smith, appeals from (1) his conviction of delivery of 15 grams or more, but less than 100 grams, of a substance containing cocaine (720 ILCS 570/401(a)(2)(A) (West 2022)) and (2) his sentence of 15 years' imprisonment. We affirm.

¶ 3                I. BACKGROUND

¶ 4    In December 2023, the State charged defendant with delivery of 15 grams or more, but less than 100 grams, of a substance containing cocaine (*id.*). Thereafter, the trial court appointed counsel for him. The matter proceeded to a jury trial.

¶ 5                A. The Jury Trial

¶ 6        At trial, the State called Inspector Samer Assaf of the Livingston County Sheriff's Office, Inspector Zachary Benning, who was Assaf's partner, and Edwin Mulero, Assaf's confidential source.

¶ 7        Assaf testified Mulero came to him with information defendant was willing to sell cocaine. Assaf had Mulero arrange to buy an ounce (approximately 28 grams) of cocaine from defendant for $1,400 in a "controlled buy." The agreed site for the sale was 208 South Main Street, apartment No. 1, in Flanagan, Illinois.

¶ 8        Assaf explained the process used during the controlled buy to maximize the certainty of the source of the cocaine. This process included searching Mulero ahead of his meeting with defendant and Assaf watching Mulero as he entered and exited the apartment. Benning's testimony also related to the procedures for the controlled buy.

¶ 9        Assaf testified he drove Mulero to a parking lot near the apartment. He equipped Mulero with a concealed recording device. During a series of calls between Mulero and defendant, whose voice Assaf recognized, defendant said he was on his way from Pontiac, Illinois, and asked Mulero to bring a scale if he had one. All but the first call in the series was captured on the recording device. Assaf provided Mulero with an electronic pocket scale. When defendant said he was about 20 minutes away, Assaf moved his car to within a few car lengths of the apartment's entrance. After a delay, Assaf saw defendant enter the apartment with another man. Shortly thereafter, Assaf watched as Mulero entered the apartment. Mulero remained in the building for approximately 13 minutes. He exited, came directly to Assaf's car, and handed Assaf a plastic baggie containing white powder. Defendant and the man who arrived with him then left the apartment and went to their vehicle.

¶ 10        Assaf and Mulero also left. When they reached an area where they would not be

seen, Assaf searched Mulero again. Mulero was not carrying anything suggesting he had compromised the sale.

¶ 11　　　　Assaf interviewed defendant on December 15, 2023. Defendant denied selling cocaine. According to Assaf, "He [said] he doesn't consider himself to sell because he doesn't make anything off of it." When Assaf asked defendant whether he shared profits from drug sales, defendant again stated he did not receive money from sales and therefore was not selling drugs. However, defendant told Assaf he was "going to take the fall for it." Defendant told Assaf he was an addict. He admitted he had formerly sold drugs but said he had stopped about a month before the interview. According to Assaf, "[defendant] said that he doesn't usually sell ounces, but a guy had been asking him for it recently."

¶ 12　　　　Assaf testified Mulero's health had declined in the three months preceding the trial. On December 4, 2023, he was able to walk normally and have a normal conversation, something he could not do when the State called him as a witness.

¶ 13　　　　On cross-examination, Assaf agreed they had not recovered the bills Mulero used to pay for the cocaine—they were not in defendant's house when it was searched.

¶ 14　　　　The parties stipulated Joni Little, an Illinois State Police forensic scientist, would testify that "she examined the substance in the baggie and made a finding that the substance was cocaine and weighed 26.7 grams." This oral stipulation is consistent with the laboratory report admitted as People's exhibit No. 1. (We note the trial court, defendant, and the State all at times incorrectly referred to the cocaine as weighing 27.6 grams. These errors appear to lack any substantive effect in this appeal. We therefore correct the errors as they appear.)

¶ 15　　　　Mulero testified for the State. He had difficulty responding to simple questions. For instance, he could not spell his last name unprompted. Further, the trial transcript contains many

notations indicating Mulero was "speaking indistinctly." However, he authenticated the recordings from the device he had worn, agreed he had purchased an ounce of cocaine from defendant for $1,400 during a controlled buy, and recalled defendant asking him to bring a scale.

¶ 16    After Mulero authenticated the recording, the State played it for the jury. The initial portion of the recording was made in Assaf's car. The closest thing to an explicit drug reference in this portion of the recording is the voice identified as defendant's asking Mulero to bring a scale. The portion of the recording made in the apartment contained multiple voices, including those identified as defendant and Mulero. Defendant's brief contains a description of this portion of the recording, which includes transcriptions of intelligible statements and identifications of speakers; the State does not challenge the description's accuracy. According to this description:

> "Mulero says *** he had [drunk] about 'six beers waiting for your ass.' Later, [defendant] can be heard saying he had gotten several counterfeit detection pens. After a couple of minutes of the people in the apartment chatting, [defendant] can be heard asking 'you got a bag?' and Mulero replying[,] 'Me? Yes.'
>
> After another couple of minutes of Mulero talking to the people in the apartment, [defendant] can be heard saying 'almost one, because she wanted thirteen and I told her twelve… so this is like 27.7, almost one.' A little bit later, [defendant] says to Mulero 'alright there you go bro… Individual? Here. I'm gonna let them clean this up. Y'all want a bump?' Someone in the background says 'sure' and [defendant] responds 'alright, go ahead and clean it up, I gotta run man.' Mulero then says to [defendant] 'alright bro, I'm gonna walk out with you.' [Defendant] then can be heard saying to someone 'there's the mess right there, I thought I'd leave it for you.' "

¶ 17    On cross-examination, defense counsel asked Mulero who "Antonio Juarez" was. Mulero said Juarez was his step-nephew. He agreed the apartment at which the deal occurred was Juarez's. He denied knowing "Fred Lurz." He agreed "Carlos Herera" was present in the apartment during the buy. He could not remember if someone else other than him, Herera, and defendant was present. He agreed he was offered "a bump" of the cocaine, but he said he put it in the bag and left. He agreed he picked up the cocaine from the kitchen table.

¶ 18    The defense called two witnesses, Carlos Herera and Fredrick Lurz.

¶ 19    Herera testified that on December 4, 2023, he was a resident of Apartment 1, 208 South Main Street. When asked who lived with him, he replied, "Antonio Juarez." On December 4, defendant and a person Herera knew as defendant's cousin arrived at the apartment at 6 or 7 p.m. Defense counsel asked if it was the three of them in the apartment then. Herera responded Juarez was also present. Counsel asked if Juarez was there "for a little bit." Herera said, "He was there."

¶ 20    Mulero, whom Herera knew as a family friend, arrived about half an hour after the other two. Herera, Juarez, defendant, and defendant's cousin watched television and drank beer; the beers were on the kitchen table. Herera testified he never saw a plastic baggie containing white powder, never saw defendant hand Mulero anything, and never saw Mulero hand defendant anything. Mulero stayed "[p]robably like a half hour, 45 minutes." Herera had a clear view of everyone in the house the whole time Mulero was present.

¶ 21    Lurz testified he knew defendant as the cousin of his fiancée and as someone he saw around Flanagan. On December 4, 2023, he was with defendant in defendant's house in Streator, Illinois. He drove defendant to Pontiac on an errand and then drove him to an apartment on Main Street in Flanagan. When the two arrived "Carlos" and "Antonio" were present. "Edwin

something"—*i.e.*, Mulero—knocked on the door. Lurz and Mulero conversed for about 10 minutes, speaking mostly about possible mutual acquaintances. Defendant and Lurz then left. While defendant and Lurz were in the apartment, defendant sat at a table facing Herera. Lurz and Mulero stood. Lurz never saw defendant hand anything to Mulero.

¶ 22   When Lurz finished testifying, the trial court asked defendant whether he intended to testify. Defendant expressed uncertainty and asked to confer with defense counsel. After a brief recess, defendant told the court he would not be testifying, and the defense rested.

¶ 23   The jury found defendant guilty. Defense counsel filed a posttrial motion, raising issues not relevant to this appeal. The trial court set a June 5, 2024, hearing date, but it denied the motion at a later date.

¶ 24                      B. The Preliminary *Krankel* Inquiry

¶ 25   At the June 5, 2024, hearing, the trial court told the parties it "need[ed] to address some things that [defendant] put in the Presentence Investigation Report [(PSI)] concerning his belief that [defense counsel was] working with the State." It concluded it should conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny into defendant's *pro se* claim of ineffective assistance of counsel.

¶ 26   According to the PSI defendant insisted he was innocent and contended counsel had done nothing but " 'set [his] case up for the state.' " When the trial court asked him to expand on this, defendant admitted being present in the apartment at the relevant time and later buying some of the drugs. However, he "gave [defense counsel] everything proving that [Antonio] did commit the crime. And the only thing [counsel] had to do was ask somebody about it; and he failed, he left all of that out." He said defense counsel did not discuss Antonio's participation with him but merely asked whether Antonio would appear if he were called. Defendant said he believed

Antonio would not. Defendant further said he had given counsel information sufficient for him to locate Antonio—and, by implication, identify "Antonio" as Antonio Juarez.

¶ 27       When questioned by the trial court, defense counsel responded he was given no way to contact "this Antonio person." He said he and defendant discussed the possibility of "Antonio" testifying. Counsel "recommended that he not testify, but did explain to [defendant] that it was up to him."

¶ 28       The trial court concluded it was unnecessary to appoint new counsel to assist defendant with his ineffective-assistance claim. The court found defense counsel "ultimately" decided against calling Juarez as a witness because he knew Juarez would not "admit that he conducted the drug transaction."

¶ 29                         C. The PSI and Sentencing Hearing

¶ 30       The PSI showed defendant, who was born in 1978, had 18 convictions, including 4 felony convictions. His most recent conviction was a Class 2 aggravated battery conviction in 2018.

¶ 31       At sentencing, the only evidence presented by either party was a collection of letters attesting to defendant's character and defendant's business certificate. Defendant made a statement in allocution in which he represented he did not "sell this package" but "simply lined the guy up to go there." He insisted the recording demonstrated Juarez was the actual drug dealer.

¶ 32       The trial court deemed defendant's criminal record was "definitely a factor in aggravation." It noted his criminality had not lessened decreased as he grew older. Defendant was 46, and his most recent conviction was for a Class 2 felony, an aggravated battery. The court stated, "I would think that at this point in your life, you would be making better decisions, not worse decisions."

¶ 33    The trial court commented the quantity of cocaine was too large to permit probation, observing, when you get to this amount of drugs that you were dealing on this day, [26.7] grams or so, that's a lot. To the point where the Legislature says don't even want to mess around with probation."

¶ 34    The trial court further noted the effect defendant's sale of 26.7 grams of cocaine could have on the Livingston County community:

"I think the State is not exaggerating to suggest that this is a large amount of cocaine for Livingston County. In the grand scheme of things, I guess, you know, they don't talk about [26.7] grams. In Livingston County, that's a lot, and that's a lot of people that that touches. So, you are not just part of the problem. You are making it worse by distributing that amount of drug within the community."

¶ 35    The trial court therefore found the offense was serious: "As far as what we see here, when you are looking at a Class X felony, delivery of a controlled substance, [26.7] grams is pretty much on the high end. *** And so, as far as the seriousness of the offense, I would put this at the higher end of seriousness of the offense when considering that."

¶ 36    The trial court further determined the quantity of cocaine sold required a sentence with a strong deterrent effect:

"And in that vein, deterrence is a strong factor. Probably one of the strongest factors that exists. Again, I don't expect drug addicts to necessarily be deterred; but when you're distributing drugs, that's another level. And there's plenty of addicts around here, unfortunately. And you're probably touching, you know, 27 people with 27 grams. *** So, I would expect that somebody dealing that level of drugs would be deterred to realize that, hey, this is going to land me some time. Particularly since

the Legislature said it's a minimum in prison. So, that's another strong factor in aggravation."

¶ 37 The trial court concluded, "[A] sentence in the middle range is an appropriate sentence given the aggravating factors." It imposed a sentence of 15 years' imprisonment.

¶ 38 Defendant moved to reconsider his sentence, arguing the trial court gave insufficient weight to the factors in mitigation and, given the facts, the sentence was excessive. Concerning factors in mitigation, he asserted his "criminal conduct neither caused nor threatened serious physical harm to another." He also claimed he did not contemplate that his criminal conduct would cause or threaten serious physical harm to another." The court denied the motion.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 On appeal, defendant argues first the trial court erred in failing to appoint new counsel for him after the preliminary *Krankel* inquiry. He next argues the court committed plain error during sentencing when it considered a factor inherent in the offense—the potential harm from the cocaine defendant sold—as a factor in aggravation. Alternatively, he argues defense counsel was ineffective for failing to raise the court's consideration of an inherent factor in the postsentencing motion.

¶ 42 A. The Trial Court's Ruling After the Preliminary *Krankel* Inquiry

¶ 43 1. *The Parties' Arguments*

¶ 44 Defendant contends the trial court order declining to appoint new counsel for defendant was manifestly erroneous. He insists the court's conclusion defense counsel could not obtain Juarez's address was inconsistent with the evidence counsel elicited at trial: Juarez lived in the apartment that was the site of the sale and was present when defendant and Mulero were in the

apartment. He further argues, considering Herera and Lurz offered uncontradicted testimony that Juarez was present in the apartment when he and Mulero were, the court was plainly wrong to find counsel " 'call[ed] the individuals who were clearly present during the transaction.' " Finally, he argues the court erred in giving any weight to his own uncertainty about whether Juarez should be called; he suggests it was counsel's responsibility, not his, to decide which witnesses to call.

¶ 45        In response, the State argues the trial court did not err in its findings after the preliminary *Krankel* inquiry. It contends, *inter alia*, that: (1) "In the face of defendant's direct assertions of futility, counsel cannot be deemed ineffective for failing to investigate an address to subpoena Juarez" and (2) given defendant's admissions suggesting he set up the transaction, he "conceded at least accomplice status on the delivery."

¶ 46        In reply, defendant asserts, *inter alia*, because the trial court forgot the transaction took place in Juarez's apartment with Juarez present, its conclusion defense counsel would have to make a significant effort to locate Juarez was contrary to the evidence.

¶ 47                2. *The Law Relating to Preliminary* Krankel *Inquiries*

¶ 48        A defendant triggers the common-law procedure derived from *Krankel* and its progeny by raising a *pro se* claim of ineffective assistance of counsel before the trial court. *People v. Ayres*, 2017 IL 120071, ¶ 11. When a defendant raises such a claim, the court must conduct an inquiry into whether any factual basis exists for the defendant's claim. *Id.* The purpose of the preliminary inquiry is to provide the information necessary for the court to decide whether to appoint new counsel to represent the defendant in his ineffective-assistance claim. *Id.* "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *People v. Jackson*, 2020 IL

124112, ¶ 97. When the court makes a ruling on the merits of a defendant's ineffective-assistance claim after a preliminary *Krankel* inquiry, we may reverse only if the decision is manifestly erroneous. *Id.* ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 49                                          3. *This Case*

¶ 50          Here, no manifest error was present in the trial court's finding that defense counsel's decision not to seek out Juarez was a matter of trial strategy. Thus, no basis existed to appoint new counsel to aid defendant in presenting his claim of ineffective assistance of counsel.

¶ 51          Initially, we suggest the parties have largely ignored what we believe is an obvious point: the defense theory that defendant *wanted* to advance was plainly frivolous. Defendant expected counsel to present evidence supporting the theory he was innocent because he neither physically delivered the cocaine nor accepted money for its delivery. This theory is inconsistent with the principle of accountability. "A person is legally accountable for the conduct of another" when "with the intent to promote or facilitate [the] commission [of an offense], he or she *** aids *** that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2022). Had defense counsel acceded to defendant's plan, he would have presented evidence that did not tend to exculpate defendant and might have tended to incriminate him. Therefore, the trial court had no need to address defendant's contention that counsel should have pursued such a defense. The frivolity of defendant's suggested course of action was, in itself, sufficient to support the conclusion the court did not err in declining to appoint new counsel for defendant.

¶ 52          Despite the frivolity of defendant's theory, the trial court chose to explore the possibility that defense counsel was ineffective for failing to investigate Juarez as a potential witness. We find the court was correct to conclude that calling Juarez would have been futile, so counsel's decision not to investigate him was not a proper basis for an ineffective-assistance claim.

¶ 53    Furthermore, defendant did not suggest Juarez could testify to anything tending to exculpate him. Defendant indicated during the inquiry he told counsel he believed Juarez would not admit he was the principal in the drug sale. This belief is objectively reasonable. Indeed, the most one might have expected is that Juarez would obey a subpoena but then invoke his right against self-incrimination (see U.S. Const., amend. V). And, as the State points out, many Illinois cases have held "it is improper for a party to call a witness whom it has reason to believe will invoke his fifth amendment privilege before the jury." *People v. Human*, 331 Ill. App. 3d 809, 819 (2002) (collecting cases). Thus, attempting to call Juarez would have been futile.

¶ 54    Moreover, even assuming Juarez was the principal, the evidence defendant planned the sale was overwhelming. For instance, Assaf testified to hearing defendant plan the sale, and the recording captured defendant, among other things, talking about something which was, " 'like 27.7, almost one,' " which was similar to the weight of the cocaine Mulero received, 26.7 grams. Thus, Juarez's testimony would not have aided defendant.

¶ 55    Defendant argues the trial court's decision was manifestly erroneous because, among other things, it was mistaken about counsel being aware of Juarez's address and gave weight to counsel's consideration of defendant's personal uncertainty about whether Juarez should be a witness. See *People v. Robinson*, 2012 IL App (4th) 101048, ¶ 33 (Only five decisions, including the decision to testify, are matters for a defendant to decide personally; all other decisions—including whether to call a witness—"are matters of trial strategy on which the ultimate decision is left to defense counsel's sound judgment."). The issues defendant notes are tangential to the court's decision, which depended on the conclusion that calling Juarez would be futile. If counsel had no reason to call Juarez, it did not matter whether his address was readily available. It also did not matter that he was one of the people the witnesses identified as being present at the

relevant time. Further, because counsel correctly concluded he need not investigate Juarez as a witness, how counsel reached that conclusion is immaterial. Our conclusion that the court properly found calling Juarez would be futile implies defendant suffered no prejudice from the decision not to call Juarez. The possibility of prejudice is necessary for a viable ineffective assistance claim. See *Jackson*, 2020 IL 124112, ¶ 90 (a viable claim of ineffective assistance of counsel must include a showing the defendant was prejudiced by the attorney's deficient performance). Where, as here, prejudice is impossible because of the nature of the defendant's claim, the claim is fatally flawed.

¶ 56 In sum, we conclude the trial court had no reason to address defendant's clearly frivolous contention he was innocent because he arranged the transaction rather than acting as the principal. At sentencing, defendant admitted, "I did not sell this package. I simply lined the guy up to go there. *** You know what I mean? I send somebody, and I get something out of it." We further conclude it would have been futile for defendant to call Juarez as a witness. Although the court's comments appear to have contained errors of fact, we do not see manifest error in what we find to be tangential matters.

¶ 57 B. Plain Error or Ineffective Assistance at Sentencing

¶ 58 Defendant next argues the trial court considered improper factors when it imposed a sentence of 15 years' imprisonment. He maintains the court considered the social harm inherent in the offense as a factor in aggravation—in other words, the sentence was the result of at least one "double enhancement." See, *e.g.*, *People v. Shaw-Sodaro*, 2023 IL App (4th) 220704, ¶ 67. He concedes he forfeited the issue by failing to raise it in his postsentencing motion, but he contends he can raise it directly under the plain-error doctrine or indirectly through a claim of ineffective assistance of counsel.

¶ 59 1. *First-Prong Plain Error*

¶ 60                                    a. The Parties' Arguments

¶ 61         Defendant concedes he forfeited his argument the trial court considered an improper sentencing factor because defense counsel failed to raise it in the posttrial motion. However, defendant contends we can address this issue as first-prong plain error The State claims the issue is not reviewable because defendant invited the error of which he now complains.

¶ 62                                    b. The Applicable Law

¶ 63                          i. *The Standard for First-Prong Plain Error*

¶ 64         "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, under the plain-error doctrine, a reviewing court may address a forfeited claim of sentencing error when a "clear or obvious error" occurred and "(1) the evidence at the sentencing hearing was closely balanced [(first-prong plain error)], or (2) the error was so egregious as to deny the defendant a fair sentencing hearing [(second-prong plain error)]." *Id.* at 545. "Without reversible error, there can be no plain error." *Jackson*, 2020 IL 124112, ¶ 88. The defendant bears the burden of persuasion in establishing plain error. *Hillier*, 237 Ill. 2d at 545.

¶ 65                                    ii. *Sentencing Generally*

¶ 66         A trial court has broad discretion in deciding what sentence it will impose. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). "The *** court must base its sentencing determination on the particular circumstances of each case." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). We presume the trial court considered all relevant factors, both mitigating and aggravating. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43.

¶ 67                          iii. *Factors Inherent in the Offense*

¶ 68    As a rule, "[a] factor that is implicit in the offense for which the defendant has been convicted generally cannot be used as an aggravating factor in sentencing for that offense." *People v. Brown*, 2023 IL App (4th) 220476, ¶ 44. "The prohibition of such a 'double enhancement' is a rule of statutory construction based on the assumption that, 'in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense.' " *Id.* (quoting *People v. Phelps*, 211 Ill. 2d 1, 12 (2004)). We apply a "strong presumption" the trial court "based its sentencing determination on proper legal reasoning," and a defendant must "affirmatively establish[ ] his or her sentence was based on improper considerations." *People v. Solis*, 2019 IL App (4th) 170084, ¶ 26. When we address whether a trial court considered an improper factor in aggravation when it imposed a sentence, we consider the record of the sentencing hearing as a whole, rather than focusing on "a few words or statements" from the court. *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18. A claim the trial court relied upon an improper factor at sentencing raises a question of law and thus is subject to *de novo* review. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65.

¶ 69    The prohibition against double enhancements does not bar the trial court from considering "the nature and circumstances of the offense." (Internal quotation marks omitted.) *People v. Thomas*, 171 Ill. 2d 207, 227 (1996). A crime, even a crime that inherently causes or threatens harm, "can have varying degrees of harm or threatened harm," and the "legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor." *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). From this, it follows "a trial court may discuss the impact a drug offense has on the community without subjecting the defendant to double enhancement." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 73. Indeed, it can do more than *discuss* the effect on the community. A court can treat the effect on the community as a factor in

aggravation when the harm or risk of harm deriving from the community in which the defendant committed the crime exceeds the harm or risk of harm inherent in the offense. See *Saldivar*, 113 Ill. 2d at 269. Put another way, specific harm to a specific community is separable from the harm inherent in the offense.

¶ 70        The Appellate Court, Second District, in *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993), held, "If a trial court intends to consider the societal harm [a] defendant's conduct threatened to cause as an aggravating factor, the record must demonstrate that the conduct of the defendant had a greater propensity to cause harm than that which is merely inherent in the offense itself." This court has followed the rule in *McCain* including in recent cases. See, *e.g.*, *People v. Williams*, 2024 IL App (4th) 230229-U, ¶ 58.

¶ 71                              c. This Case

¶ 72                       i. *Invited Error and the Plain-Error Claim*

¶ 73        The State argues that, because defense counsel argued defendant's offense threatened little harm, he is estopped under the invited- error doctrine from arguing his sentence was the result of the trial court improperly considering harm inherent in the offense.

¶ 74        "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." (Internal quotation marks omitted.) *People v. Guy*, 2025 IL 129967, ¶ 68. A defendant who actively invites or acquiesces to a course of conduct in a proceeding cannot raise a plain-error challenge on appeal to the trial court's following the invited course of conduct. See *People v. Quezada*, 2024 IL 128805, ¶ 59 (holding a defendant was estopped from asserting the admission of certain evidence was plain error when counsel agreed to its admission). This rule exists "because invited error or acquiescence

does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." (Internal quotation marks omitted.) *Id.*

¶ 75        The State argues:

> "In this case, defense counsel specifically invited consideration of the serious harm factors, since he argued [in his postsentencing motion] the trial court should consider the purported lack of harm to others, as 'anti-aggravating,' that is, as a mitigating factor. Since defendant invited the trial court to consider the serious or societal harm, or, rather the lack thereof, resulting from his delivery of the cocaine, he procedurally defaulted this issue for review."

¶ 76        We reject the use of the invited-error doctrine under the circumstances present here. "[T]he commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm." *Saldivar*, 113 Ill. 2d at 269. Here, the posttrial motion stated, "The defendant's criminal conduct neither caused nor threatened serious physical harm to another." That was a request for the trial court to consider the specific risk of harm the offense caused and not an invitation or acquiescence to consider the risk of harm inherent in the offense. As defense counsel neither invited nor acquiesced to the consideration of inherent harm as a factor in aggravation, no invited error occurred.

¶ 77                              ii. *The Merits*

¶ 78        Defendant fails to establish first-prong plain error because he fails to establish a "clear or obvious error occurred." *Hillier*, 237 Ill. 2d at 545. He does not demonstrate the trial court's comments about the potential harm of the sale of cocaine in Livingston County failed to separate those specific harms from the potential harm inherent in any sale of a similar amount of cocaine regardless of the locale.

¶ 79 Defendant notes 26.7 grams of cocaine is clearly at the lower end of the 15-to-100-gram range for his offense (see 720 ILCS 570/401(a)(2)(A) (West 2022)), and he therefore contends the court's conclusion the crime was at the upper end of seriousness could only be "based on the perceived harm" the cocaine could have caused "to Livingston County." He argues the legislature's division of the offense of delivery of cocaine into four weight-based sentencing classes (see 720 ILCS 570/401(a)(2)(A)-(D) (West 2022)) showed it had "already considered" the "societal harm caused by the delivery of various weights of cocaine." He contends the trial court said nothing to distinguish the potential harm his crime caused from the potential harm inherent in the delivery of 26.7 grams of cocaine in the general case.

¶ 80 Concerning the trial court's consideration of deterrence, defendant asserts, "[T]he purported deterrence factor mentioned by [the court] was really just another consideration of inherent societal harm." He argues its comments "focused entirely on inherent, generalized harm to Livingston County," and it therefore necessarily ignored the legislature's consideration of the "generalized harm" associated with the minimum weight required to commit a particular level of the offense. Defendant thus explicitly equates "generalized harm to Livingston County" with the generalized harm considered by the legislature when setting the sentencing ranges for the grades of the offenses. Defendant's arguments fail because he does not explain why the trial court's reference to the potential harms of the crime to Livingston County as a distinct community were inadequate to distinguish those potential harms from the potential harms to society as a whole. The specific effect of an offense on a specific community is an instance of the "varying quantum of harm [that] may constitute an aggravating factor" (*Saldivar*, 113 Ill. 2d at 269) and is thus a factor the court may consider. Defendant points out the facts of this case have similarities to those in

*Williams*, 2024 IL App (4th) 230229-U, ¶ 65, in which this court held the trial court impermissibly treated the threat of harm inherent in the offense as a factor in aggravation.

¶ 81    In *Williams*, the trial court commented on the aggravating factors as follows:

" 'I do think as the State has argued that deterrence is a very strong factor in this case, one of the strongest factors. I recognize that we are in the midst of an epidemic I would say in regards to the drug problem in not just our county but our state, our community, our country; and while I understand that in the grand scheme of things your involvement is small, it's big for this community; and the reality is what you did by your actions was contribute to that problem in Livingston County. You made the problem worse so you're not just an addict from Livingston County maybe doing a little trading off here and there ***. That's one thing we see fairly regularly, but you are somebody that has no reason to be here. ***

So I think that a strong message needs to be sent that it's just not going to be tolerated. I don't care where you are from. *** [W]herever it is, you are not bringing methamphetamine into this community, period.

So I do think deterrence was a strong message. There was clearly a threat of harm to others based upon the substance itself and the severity and consequences of using that substance, and I believe you were on parole at the time that this offense was committed. So those are all strong aggravating factors in the case as well as your prior record.' " *Id.* ¶ 64.

The court's focus was the national drug epidemic as it manifested in Livingston County, not the potential harms particular to Livingston County. Here, by contrast, the court's comments focused on the potential harms in Livingston County as a distinct community, where such quantities of

drugs are not common. "[A] trial court may discuss the impact a drug offense has on the community without subjecting the defendant to double enhancement." *McGath*, 2017 IL App (4th) 150608, ¶ 73.

¶ 82        Admittedly, the trial court was unquestionably vague in identifying the potential harm of defendant's crime specific to Livingston County, but we conclude the comments, when taken in their entirety, remain comments on "the nature and circumstances of the offense" as applied to the facts of this case. (Internal quotation marks omitted.) *Thomas*, 171 Ill. 2d at 227. The court specifically noted its concern was Livingston County when it stated: "[T]here's plenty of addicts *around here*, unfortunately. And [defendant was] probably touching, you know, 27 people with 27 grams." (Emphasis added.) More importantly, the court's comments, when read in context, addressed counsel's efforts to lessen the seriousness of the offense and the State's response. The court ties these comments into its discussion of defendant's criminal history and the fact that defendant, at 46 years of age, and after "a lengthy pattern of criminal activity," had chosen to become involved in such a serious offense. A reading of the court's entire ruling shows there was no clear or obvious error. See *Hillier*, 237 Ill. 2d at 545.

¶ 83                        2. *Ineffective Assistance of Counsel*

¶ 84        Alternatively, defendant argues, "Counsel's failure to object to improper evidence in aggravation at sentencing did not serve any legitimate strategic purpose and thus fell below an objective standard of reasonableness." He contends, because the evidence was improper for the reasons he set out in his plain-error argument, he was prejudiced by counsel's failure to preserve the argument.

¶ 85        Under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984), to establish the ineffectiveness of counsel, a defendant must show:

"(1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. [Citation.] Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90.

We review *de novo* a claim of ineffective assistance of counsel when a defendant raises it for the first time on appeal. *Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 86 Defendant's argument on this point fails because he cannot show the inclusion of a double-enhancement argument in the motion would have had a reasonable probability of changing the outcome of his sentencing hearing. As we explained above, defendant's plain-error argument fails to show the trial court's focus on the potential harm to Livingston County failed to distinguish the general potential harm inherent in the offense from the potential harm to Livingston County resulting from the county's specific characteristics. Had defendant raised this argument in a postsentencing motion, the trial court could have rejected it for the reasons we reject it here.

¶ 87 III. CONCLUSION

¶ 88 For the reasons stated, we affirm defendant's conviction and sentence.

¶ 89 Affirmed.